[840 NE2d 68, 806 NYS2d 99]

CONSUMERS UNION OF U.S., INC., et al., Appellants-Respondents, v STATE OF NEW YORK et al., Respondents-Appellants, and THE CHARITABLE ASSET FOUNDATION, Appellant, et al., Respondents.

Argued April 26, 2005; decided June 20, 2005

**POINTS OF COUNSEL**

*Law Office of Mark Scherzer,* New York City (*Mark Scherzer* and *A. Christopher Wieber* of counsel), for appellants-respondents. I. Plaintiffs' allegations state a takings claim.

(*Cranley v National Life Ins. Co. of Vt.*, 318 F3d 105; *Arnav Indus., Inc. Retirement Trust v Brown, Raysman, Millstein, Felder & Steiner*, 96 NY2d 300; *Leon v Martinez*, 84 NY2d 83; *Rovello v Orofino Realty Co.*, 40 NY2d 633; *Ullmann v Norma Kamali, Inc.*, 207 AD2d 691; *Philip Morris, Inc. v Harshbarger*, 159 F3d 670; *Meriden Trust & Safe Deposit Co. v Federal Deposit Ins. Corp.*, 62 F3d 449; *Garelick v Sullivan*, 987 F2d 913, cert denied sub nom. *Garelick v Shalala*, 510 US 821; *Allied Structural Steel Co. v Spannaus*, 438 US 234; *Chicago, B. & Q. R. Co. v Chicago*, 166 US 226.) II. Plaintiffs adequately alleged a due process claim. (*Niagara Recycling v Town of Niagara*, 83 AD2d 316; *Association of Surrogates & Supreme Ct. Reporters Within City of N.Y. v State of New York*, 940 F2d 766, 502 US 1058; *Burtnieks v City of New York*, 716 F2d 982.) III. Plaintiffs adequately allege an impairment of contract claim. (*Trustees of Dartmouth Coll. v Woodward*, 4 Wheat [17 US] 518; *Pennsylvania R.R. Co. v State of New York*, 15 AD2d 269; *Matter of Mount Sinai Hosp.*, 250 NY 103.) IV. Plaintiffs' 42 USC § 1983 claims survive with its constitutional claims (fifth cause of action). V. Plaintiffs have adequately alleged Not-For-Profit Corporation Law, breach of fiduciary duty and constructive trusts claims (sixth, seventh and eighth causes of action). (*Henness v Hunt*, 272 AD2d 756.) VI. Plaintiffs state a claim that the legislation violates article III, § 17 of the New York Constitution. (*Matter of New York El. R.R. Co.*, 70 NY 327; *Matter of Union Ferry Co. of Brooklyn*, 98 NY 139; *Matter of Decker v Pouvailsmith Corp.*, 252 NY 1; *19th St. Assoc. v State of New York*, 172 AD2d 380, 79 NY2d 434; *People v Giordano*, 87 NY2d 441; *Bush Term. Co. v City of New York*, 152 Misc 144; *Hermitage Co. v Goldfogle*, 204 App Div 710, 236 NY 554; *Smith v Government of Virgin Islands*, 375 F2d 714; *Matter of Gilbert El. Ry. Co. v Kobbe*, 70 NY 361; *Matter of Mayor of N.Y. [Elm St.]*, 246 NY 72.) VII. Plaintiffs' election not to seek a preliminary injunction against the conversion does not entitle defendants to dismissal of the amended complaint. (*Nassau Trust Co. v Montrose Concrete Prods. Corp.*, 56 NY2d 175; *Besicorp Group v Enowitz*, 235 AD2d 761; *Matter of Schulz v State of New York*, 81 NY2d 336; *New York Pub. Interest Research Groups v Levitt*, 62 AD2d 1074; *Burns v Egan*, 117 AD2d 38; *Saratoga County Chamber of Commerce v Pataki*, 100 NY2d 801; *Consolidated Gold Fields PLC v Minorco, S.A.*, 871 F2d 252; *Sonesta Intl. Hotels Corp. v Wellington Assoc.*, 483 F2d 247.)

*Eliot Spitzer, Attorney General,* New York City (*Robert H. Easton* and *Caitlin J. Halligan* of counsel), for State of New York

and others, respondents-appellants. I. Given Empire Health-Choice, Inc.'s voluntary decision to pursue conversion, plaintiffs' constitutional claims fail for want of state action. (*Sega v State of New York*, 60 NY2d 183; *Cranley v National Life Ins. Co. of Vt.*, 318 F3d 105; *Tancredi v Metropolitan Life Ins. Co.*, 316 F3d 308, 539 US 942; *SHAD Alliance v Smith Haven Mall*, 66 NY2d 496; *City of New York v State of New York*, 94 NY2d 577; *People v Devlin*, 33 NY 269; *FCC v Beach Communications, Inc.*, 508 US 307; *Philip Morris, Inc. v Harshbarger*, 159 F3d 670; *Meriden Trust & Safe Deposit Co. v Federal Deposit Ins. Corp.*, 62 F3d 449; *Garelick v Sullivan*, 987 F2d 913.) II. In the absence of any contract or substantial impairment thereof, plaintiffs' Contracts Clause claim was properly dismissed. (*Energy Reserves Group, Inc. v Kansas Power & Light Co.*, 459 US 400; *Ballentine v Koch*, 89 NY2d 51; *Pennsylvania R.R. Co. v State of New York*, 11 NY2d 504; *Dodge v Board of Ed. of Chicago*, 302 US 74; *Camardo v Board of Educ. of City School Dist.*, 79 AD2d 864, 53 NY2d 795; *Cook v City of Binghamton*, 48 NY2d 323.) III. Plaintiffs' due process claims were properly dismissed. (*Board of Regents of State Colleges v Roth*, 408 US 564; *Town of Orangetown v Magee*, 88 NY2d 41; *Matter of Mount Sinai Hosp.*, 250 NY 103; *Grobe v Erie County Mut. Ins. Co.*, 39 App Div 183, 169 NY 613; *Matter of Manhattan Eye, Ear & Throat Hosp. v Spitzer*, 186 Misc 2d 126; *Phillips v Washington Legal Foundation*, 524 US 156; *College Savings Bank v Florida Prepaid Postsecondary Ed. Expense Bd.*, 527 US 666; *Armstrong v United States*, 364 US 40; *Kane v New York El. R.R. Co.*, 125 NY 164; *Rogin v Bensalem Twp.*, 616 F2d 680.) IV. Plaintiffs' takings claims were properly dismissed. (*Meriden Trust & Safe Deposit Co. v Federal Deposit Ins. Corp.*, 62 F3d 449; *Garelick v Sullivan*, 987 F2d 913; *Illinois Clean Energy Community Found. v Filan*, 392 F3d 934; *Loretto v Teleprompter Manhattan CATV Corp.*, 458 US 419; *Soon Duck Kim v City of New York*, 90 NY2d 1; *Pennsylvania Coal Co. v Mahon*, 260 US 393; *Keystone Bituminous Coal Assn. v DeBenedictis*, 480 US 470; *Ruckelshaus v Monsanto Co.*, 467 US 986; *Monterey v Del Monte Dunes at Monterey, Ltd.*, 526 US 687; *Connolly v Pension Benefit Guaranty Corporation*, 475 US 211.) V. Chapter 1 of the Laws of 2002 comports with the Exclusive Privileges Clause because it confers no rights in the nature of a monopoly. (*Matter of Union Ferry Co. of Brooklyn*, 98 NY 139; *People v Giordano*, 87 NY2d 441; *Matter of Mayor of N.Y. [Elm St.]*, 246 NY 72; *Matter of Henneberger*, 155 NY 420; *Farrington v Pinckney*, 1 NY2d 74; *Trustees of Exempt Firemen's Benevolent Fund of City of N.Y. v*

*Roome,* 93 NY 313; *People ex rel. Tyroler v Warden of City Prison of City of N.Y.,* 157 NY 116; *City of New York v State of New York,* 94 NY2d 577; *People v Devlin,* 33 NY 269; *Proprietors of Charles River Bridge v Proprietors of Warren Bridge,* 11 Pet [36 US] 420.)

*Weil, Gotshal & Manges LLP,* New York City (*Steven Alan Reiss, Janet L. Horn* and *Adam K. Grant* of counsel), and *Hinman Straub P.C.,* Albany (*Bartley J. Costello, III* and *Kimberly C. Lawrence* of counsel), for Empire HealthChoice, Inc., respondent-appellant. I. The complaint must be dismissed because it implicates a nonjusticiable political question. (*Matter of New York State Inspection, Sec. & Law Enforcement Empls., Dist. Council 82, AFSCME, AFL-CIO v Cuomo,* 64 NY2d 233; *767 Third Ave. Assoc. v Consulate Gen. of Socialist Fed. Republic of Yugoslavia,* 218 F3d 152; *Kadic v Karadzic,* 70 F3d 232; *Matter of Richmond Hill Block Assn. v Dinkins,* 149 Misc 2d 654; *Saratoga County Chamber of Commerce v Pataki,* 100 NY2d 801; *Manigault v Springs,* 199 US 473; *T.D. v New York State Off. of Mental Health,* 91 NY2d 860; *Parochial Bus Sys. v Board of Educ. of City of N.Y.,* 60 NY2d 539.) II. Plaintiffs lack standing to assert any of their claims. (*Society of Plastics Indus. v County of Suffolk,* 77 NY2d 761; *Rudder v Pataki,* 93 NY2d 273; *Matter of Sun-Brite Car Wash v Board of Zoning & Appeals of Town of N. Hempstead,* 69 NY2d 406; *Matter of Colella v Board of Assessors of County of Nassau,* 95 NY2d 401; *Matter of Energy Assn. of N.Y. State v Public Serv. Commn. of State of N.Y.,* 273 AD2d 708; *Matter of Lee v New York City Dept. of Hous. Preserv. & Dev.,* 212 AD2d 453; *Matter of Transactive Corp. v New York State Dept. of Social Servs.,* 92 NY2d 579; *Matter of Friends World Coll. v Nicklin,* 249 AD2d 393; *Braker Mem. Home v White,* 121 Misc 2d 544.) III. The courts below properly dismissed plaintiffs' claims against Empire HealthChoice, Inc.'s Board of Directors for violation of the Not-For-Profit Corporation Law and breach of fiduciary duty. (*Rabouin v Metropolitan Life Ins. Co.,* 182 Misc 2d 632, 282 AD2d 381; *Auerbach v Bennett,* 47 NY2d 619; *Levine v Levine,* 184 AD2d 53; *Matter of Breezy Point Coop. [Young],* 123 AD2d 354; *Stuart Silver Assoc. v Baco Dev. Corp.,* 245 AD2d 96; *Gillman v Pebble Cove Home Owners Assn.,* 154 AD2d 508; *Matter of Manhattan Eye, Ear & Throat Hosp. v Spitzer,* 186 Misc 2d 126; *S.H. & Helen R. Scheuer Family Found. v 61 Assoc.,* 179 AD2d 65; *Matter of Vale,* 291 AD2d 353; *Matter of Hahn,* 93 AD2d 583.) IV. The court below properly dismissed plaintiffs' Takings Clause claims. (*Evac, LLC v Pataki,* 89 F Supp 2d 250; *Universal Sanitation*

*Corp. v Trade Waste Commn. of City of N.Y.,* 940 F Supp 656; *Tancredi v Metropolitan Life Ins. Co.,* 149 F Supp 2d 80, 316 F3d 308, 539 US 942; *Board of Regents of State Colleges v Roth,* 408 US 564; *Matter of Cadman Plaza N. v New York City Dept. of Hous. Preserv. & Dev.,* 290 AD2d 344; *Lucas v South Carolina Coastal Council,* 505 US 1003; *Grobe v Erie County Mut. Ins. Co.,* 39 App Div 183, 169 NY 613; *Matter of Mount Sinai Hosp.,* 250 NY 103; *Armstrong v United States,* 364 US 40; *Keefe v Annpaul Realty Co.,* 215 App Div 301, 243 NY 647.) V. Plaintiffs' due process claim fails because the authorizing legislation provides for adequate procedures to contest and challenge the conversion. (*Rudolph v Cuomo,* 916 F Supp 1308, *affd sub nom. Allen v Cuomo,* 100 F3d 253; *Mathews v Eldridge,* 424 US 319; *Sanitation & Recycling Indus., Inc. v City of New York,* 107 F3d 985; *Wegman's Food Mkts. v State of New York,* 76 AD2d 95; *Highland Farms Dairy, Inc. v Agnew,* 300 US 608; *Williamson County Regional Planning Comm'n v Hamilton Bank of Johnson City,* 473 US 172; *Empire Tr. Mix, Inc. v Giuliani,* 37 F Supp 2d 331.) VI. The courts below properly dismissed plaintiffs' claim for violation of the Contracts Clause. (*Tancredi v Metropolitan Life Ins. Co.,* 149 F Supp 2d 80, 316 F3d 308, 539 US 942; *Home Bldg. & Loan Assn. v Blaisdell,* 290 US 398; *United States Trust Co. of N.Y. v New Jersey,* 431 US 1; *Energy Reserves Group, Inc. v Kansas Power & Light Co.,* 459 US 400; *Medical Socy. of State of N.Y. v Sobol,* 192 AD2d 78; *People v Shepard,* 50 NY2d 640; *Lord v Equitable Life Assur. Socy. of U.S.,* 194 NY 212; *Pennsylvania R.R. Co. v State of New York,* 15 AD2d 269; *Matter of Mount Sinai Hosp.,* 250 NY 103; *Methodist Hosp. of Brooklyn v State Ins. Fund,* 117 Misc 2d 178, 102 AD2d 367, 64 NY2d 365, 474 US 801.) VII. The courts below erred in denying defendants' motion to dismiss because the amended complaint fails to state a cause of action under article III, § 17 of the New York Constitution. (*Hotel Dorset Co. v Trust for Cultural Resources of City of N.Y.,* 46 NY2d 358; *Matter of Mayor of N.Y. [Elm St.],* 246 NY 72; *Matter of Union Ferry Co. of Brooklyn,* 98 NY 139; *Trustees of Exempt Firemen's Benevolent Fund v Roome,* 93 NY 313; *Rochester Gas & Elec. Corp. v Public Serv. Commn. of State of N.Y.,* 71 NY2d 313; *City of New York v State of New York,* 94 NY2d 577; *People Devlin,* 33 NY 269; *Farrington v Pinckney,* 1 NY2d 74; *Stapleton v Pinckney,* 293 NY 330; *American Consumer Indus. v City of New York,* 28 AD2d 38.) VIII. The courts below erred in failing to dismiss the amended complaint because there is no relief that may be granted against Empire HealthChoice, Inc. (*Richardson v Coy,*

28 AD2d 640; *Matter of Schulz v State of New York*, 81 NY2d 336; *Burns v Egan*, 117 AD2d 38; *New York Pub. Interest Research Groups v Levitt*, 62 AD2d 1074; *Consolidated Gold Fields PLC v Minorco, S.A.*, 871 F2d 252; *Sonesta Intl. Hotels Corp. v Wellington Assoc.*, 483 F2d 247; *United States v Sperry Corp.*, 493 US 52; *All Terrain Props. v Hoy*, 265 AD2d 87; *McSherry v Giannuzzi*, 717 F Supp 238; *Simon v Safelite Glass Corp.*, 128 F3d 68.)

*Proskauer Rose LLP,* New York City (*Steven E. Obus* and *Edward S. Kornreich* of counsel), for appellant. I. The dismissal of plaintiffs' complaint should be affirmed. (*Trustees of Dartmouth Coll. v Woodward*, 4 Wheat [17 US] 518; *Lord v Equitable Life Assur. Socy. of U.S.*, 194 NY 212; *Alco Gravure, Inc. v Knapp Found.*, 64 NY2d 458; *Matter of Mount Sinai Hosp.*, 128 Misc 476, 223 App Div 836, 250 NY 103; *Armstrong v United States*, 364 US 40; *Matter of Multiple Sclerosis Serv. Org. of N.Y. [New York City Ch. of Natl. Multiple Sclerosis Socy.]*, 68 NY2d 32; *Illinois Clean Energy Community Found. v Filan*, 392 F3d 934; *Webb's Fabulous Pharmacies, Inc. v Beckwith*, 449 US 155; *Phillips v Washington Legal Foundation*, 524 US 156; *Matter of Wolpoff v Cuomo*, 80 NY2d 70.) II. Chapter 1 of the Laws of 2002 comports with article III, § 17 of the New York Constitution. (*Trustees of Exempt Firemen's Benevolent Fund of City of N.Y. v Roome*, 93 NY 313; *Matter of Union Ferry Co. of Brooklyn*, 98 NY 139; *Matter of Gilbert El. Ry. Co. v Kobbe*, 70 NY 361; *Lord v Equitable Life Assur. Socy. of U.S.*, 194 NY 212; *Matter of Montefiore Home v Prendergast*, 159 App Div 644, 211 NY 549; *Grumet v Cuomo*, 90 NY2d 57; *Hotel Dorset Co. v Trust for Cultural Resources of City of N.Y.*, 46 NY2d 358; *Matter of McAneny v Board of Estimate & Apportionment of City of N.Y.*, 232 NY 377; *Fox v Mohawk & Hudson Riv. Humane Socy.*, 165 NY 517; *Bush v New York Life Ins. Co.*, 135 App Div 447.)

**OPINION OF THE COURT**

READ, J.

The issue in these appeals is whether plaintiffs have stated a viable cause of action to challenge the legislation authorizing the conversion of defendant Empire HealthChoice, Inc., doing business as Empire Blue Cross and Blue Shield (Empire) from a not-for-profit to a for-profit corporation, and directing that certain of Empire's assets be used for various public health and charitable purposes. For the reasons that follow, we conclude that plaintiffs' allegations are legally insufficient to support any cognizable cause of action.

## I.

### Empire's Origins and Evolution

Empire began as the Associated Hospital Service (AHS), a membership corporation[1] formed in 1934 to provide workers with affordable hospital care. AHS was an outgrowth of "the Depression and one especially disturbing consequence of it: voluntary hospitals stood on the edge of bankruptcy because they lacked the revenues to stay in business while (the cause of their problems) millions of citizens went without hospital and other needed care because they lacked the money to pay for it" (Brown, *Capture and Culture: Organizational Identity in New York Blue Cross*, 16 J Health Pol, Pol'y & L 651, 653 [Winter 1991]).[2]

AHS's "key organizational task" when founded was to "build[ ] a financing linkage between people who needed care and hospitals that needed revenue" (*id.* at 655). AHS did this by offering prepaid "hospital service plans," which channeled revenue to the hospitals and made affordable hospital care available to workers. For a monthly fee, AHS contracted with subscribers for up to 21 days of hospital care a year. AHS "work[ed] closely with the hospitals, paying them directly instead of indemnifying patients whom the hospitals then billed. [AHS] was, and was intended to be, the hospitals' exchequer, their financial alter ego" (*id.*).

Hospital service plans were not unique to New York. As they spread throughout the nation, "[a] number of state departments of insurance had ruled that hospital service contracts, even if issued by one hospital, were a form of insurance and that hospital service policies could be issued only by stock and mutual insurance companies which met the established requirements as to capital stock, reserves, and assessments" (Rorem, *Enabling Legislation for Non-Profit Hospital Service Plans*, 6 L & Contemp Probs 528, 529 [1939]). This issue "came to a head" in New York in 1933, when the Superintendent of Insurance "advised that such a function, although desirable, could be performed only by a stock or mutual insurance company. New York civic leaders, hospital administrators and trustees, and physicians cooperated in drafting and sponsoring an enabling

---

1. The Membership Corporations Law was a predecessor of the Not-For-Profit Corporation Law (*see* N-PCL 103).
2. Plaintiffs incorporated this article into their complaint.

act" (*id.* at 529-530; *see* L 1934, ch 595; *see also* Comment, *Group Health Plans: Some Legal and Economic Aspects*, 53 Yale LJ 162, 173-174 [1943] [discussing legislation adopting statutory controls adapted to group health plans]). The result was article 14 of the Insurance Law. In 1939, the Legislature recodified the Insurance Law and replaced article 14 with article IX-C, which addressed nonprofit medical indemnity corporations as well as hospital service corporations (L 1939, ch 882). These corporations were exempt from state and local taxes and were subject to tailored requirements. Article 43 of the present-day Insurance Law, which governs nonprofit health plans, derives from articles 14 and IX-C.

At the urging of its member hospitals, AHS became the intermediary for Medicare Part A in New York in 1965. In taking on this role, Empire became even more thoroughly enmeshed in the operation of its member hospitals by specifying accounting practices, cost definitions and cost allocations for Medicare.

In 1944, United Medical Service, Inc. (UMS), also a membership corporation, was formed to provide coverage for physician services. AHS and UMS merged in 1974 to form Blue Cross and Blue Shield of Greater New York, a Type B corporation under the Not-For-Profit Corporation Law. This entity merged with Blue Cross of Northeastern New York, Inc. in 1985 and became Empire Blue Cross and Blue Shield.

Empire initially offered only group plans, but later added individual coverage. It fixed premiums according to "community rating," in which all subscribers in a given locality are charged the same rate regardless of health risk, and allowed "open enrollment," accepting all applicants. For many years, commercial insurers did not routinely offer health coverage, which was not viewed as profitable, and so Empire had no competition. Further, the federal government encouraged plans like Empire by granting them tax-exempt status under section 501 (c) (4) of the Internal Revenue Code ([IRC] 26 USC) as social welfare organizations.[3]

Empire experienced financial difficulties almost from its very beginnings because of the high costs of open enrollment and

---

**3.** A social welfare organization has as its exempt function the social welfare of the public (IRC § 501 [c] [4] [A] [provides tax exemption for "'(c)ivic leagues or organizations not organized for profit but operated exclusively for the promotion of social welfare"]). "Social welfare" is equated by regulation with the "common good and general welfare" and with "civic betterments and social improvements" (Treasury Regulations [26 CFR] § 1.501[c][4]-1 [a] [2] [i]). Many organizations with federal tax-exempt status are not charities,

community rating. Further, commercial insurers slowly began entering the health insurance market. By using experience rating, with premiums based on claims experience, and avoiding open enrollment, commercial insurers were able to offer lower premiums to healthier groups and individuals. While Empire also used experience rating for some products, it continued its open-enrollment and community rating policies as the "insurer of last resort."

Because of Empire's critical role in New York's health care delivery system and its high costs and continuing financial troubles, the Legislature favored it over its commercial counterparts. For example, Empire was allowed to reimburse hospitals on the basis of actual costs, while commercial insurers were required to reimburse hospital charges. When the Legislature in 1983 enacted the New York Prospective Hospital Reimbursement Methodology (NYPHRM), a system for cost controls and rate-setting at hospitals, Empire was afforded an advantage over commercial insurers, which were required to pay a surcharge over and above the rate paid by Empire. Empire was exempt from "every state, county, municipal and school tax" (*see* Insurance Law § 4310 [j]).

In the mid-1980's, Empire suffered a severe blow when the United States General Accounting Office issued a report concluding that the underwriting practices of Empire and other Blue Cross plans were similar to those of commercial insurers. Congress responded by revoking the Blues' tax exemption.[4]

In the early 1990's, Empire was beset with management problems, high administrative expenses and fraud, all causing

---

including labor organizations (IRC § 501 [c] [5]), trade associations (IRC § 501 [c] [6]), fraternal societies (IRC § 501 [c] [10]) and social clubs (IRC § 501 [c] [7]).

4. *See* Tax Reform Act of 1986, Pub L 99-514, § 1012 (a), 100 US Stat 2085, 2394 (1986), codified at IRC § 501 (m) (providing that section 501 [c] [4] organizations are exempt from taxation "only if no substantial part of [their] activities consist[ ] of providing commercial-type insurance," unless they subsidize premiums for many low-income enrollees or their activities fall within certain other narrow exceptions; under IRC § 833, the Blues retain certain tax advantages by calculating taxable income in a manner different from that used by commercial insurers); *see also* Singer, *The Conversion Conundrum: The State and Federal Response to Hospitals' Changes in Charitable Status*, 23 Am JL & Med 221, 226 n 24 ("As a result of the Tax Reform Act of 1986, Blue Cross plans were stripped of their federal tax exemption, on the basis that the selling of insurance was not a charitable activity under the Internal Revenue Code § 501 [m]. . . . This left Blue Cross plans without the ability to secure tax-exempt financing and yet unable to sell stock because of their nonprofit structure when first established under enabling legislation").

significant financial losses. The growth of health maintenance organizations (HMOs) in the 1990's further eroded Empire's subscriber base as healthier groups and individuals switched to more economical managed care plans.

By 1992, Empire's future looked bleak. Upon applying to the Superintendent for significant rate increases, Empire suggested that without them its cash reserves would be exhausted in a matter of months. In January 1993, the Legislature averted this crisis with a $100 million cash infusion (L 1993, ch 1).[5] These funds were supposed to shore up Empire until a series of laws took effect, which were crafted to make Empire more competitive by eliminating the major distinctions between it and commercial insurers. For example, the Legislature required health maintenance organizations and commercial insurers in the small group market to use community rating (L 1992, ch 501); a "risk adjustment" process was enacted, which essentially required insurers and HMOs to compensate other providers who offered coverage to higher-risk populations (*id.*); and the Legislature mandated that HMOs offer policies to individuals on an open-enrollment/community rated basis (L 1995, ch 504). These statutes relieved Empire of its unique role as New York's "insurer of last resort." Accordingly, the Legislature soon removed the favorable rate differential that Empire had enjoyed under NYPHRM (L 1996, ch 639).

<u>Empire's Original Restructuring Plan</u>

Notwithstanding state subsidies and other favorable legislative action, Empire lost roughly $800 million and half its subscriber base in the 10-year period from 1986 to 1995. In light of its deteriorating prospects, Empire decided to restructure.

Under Empire's original restructuring plan, substantially all its assets, liabilities and businesses were to be transferred to wholly owned for-profit subsidiaries in exchange for 100% of the subsidiaries' outstanding and newly issued common stock. This transfer was to be followed by an initial public offering in which a portion of the stock would be sold to the public. Proceeds from the offering and all outstanding stock, approximating 100% of the value of the not-for-profit's assets, would then be transferred from "old" Empire to a newly formed tax-exempt charitable foundation "dedicated to promoting the availability and acces-

---

**5.** This bailout was contingent upon Empire's discontinuing a lawsuit challenging the State's financing and use of a malpractice insurance fund.

sibility of high quality healthcare and related services to the people of the State of New York." "Old" Empire would dissolve and "new" Empire would continue to offer health insurance, but as a for-profit corporation with greater potential for becoming and remaining competitive. Empire's Board of Directors looked at other options, including dissolving or merging with another entity, but determined that restructuring along these lines was more desirable.[6]

This proposed restructuring was subject to the Not-For-Profit Corporation Law's provisions governing the disposition of a corporation's assets. For example, under N-PCL 510 and 511, Type B not-for-profit corporations may sell all their assets with Supreme Court approval and on notice to the Attorney General. After dissolution,

> "[a]ssets received and held by the corporation . . . shall be distributed to one or more domestic or foreign corporations or other organizations *engaged in activities substantially similar to those of the dissolved corporation* . . . as ordered by the court to which such plan is submitted for approval under section 1002 (Authorization of plan)" (N-PCL 1005 [a] [3] [A] [emphasis added]).

Although its financial picture had brightened somewhat by the end of 1998, Empire concluded that its not-for-profit form crippled its chances to attract sufficient capital to compete effectively in New York's health care market. Without restructuring, Empire predicted serious future financial losses, and so actively pursued its restructuring plan with the Department of Insurance.

Public hearings were held in 1999, and Empire formally submitted its proposed plan to the Superintendent later that year. In the fall of 1999, the Attorney General opined that Empire's restructuring would require a change in Insurance Law § 4301 (j) as well as Supreme Court and regulatory approval (*see* Press Release, Sept. 1, 1999, Spitzer Airs Concerns on Blue Cross/Blue Shield Conversion, <http://www.oag.

---

6. For example, dissolution would have provided "no mechanism to unlock the going-concern value of Empire's profitable business lines [and] could entail significant waste of valuable assets" (Testimony of Ira M. Millstein, outside counsel to Empire, before the New York State Assembly Standing Committees on Insurance and Health, Apr. 11, 1997, at 15). It would also remove Empire as an insurer in New York State, lessening competition to the detriment of consumers.

state.ny.us/press/1999/sep/sep01a_99.html> [last updated Jan. 24, 2003], cached at <http://www.courts.state.ny.us/reporter/webdocs/spitzer_concerns_bluecross_conversion.htm>; *see also* May 1999 Mem to Attorney General, Proposed Conversion to For-Profit Status by Empire Blue Cross and Blue Shield, in Josephson, *Health Care Litigation: What You Need to Know After Pegram; Fiduciary Accountability; Recent Cases and Investigations; Pending Cases*, 1216 PLI/Corp 581, 711).[7] On December 29, 1999, the Superintendent issued an opinion and decision nonetheless approving Empire's reorganization plan.

Disagreeing with the Attorney General about the need for legislative action, the Superintendent opined that section 4301 (j) "which prohibits the conversion of a not-for-profit health service corporation into a for-profit corporation, [was] not applicable to Empire's restructuring." According to the Superintendent, Empire's restructuring was governed under articles 71 and 74 of the Insurance Law, and was not a "conversion" as "Empire will exchange its assets for different assets having equal value and transfer those assets to an independent entity formed to carry out not-for-profit public purposes," and would then dissolve.

While Empire secured the Superintendent's approval of its restructuring plan, the Attorney General's endorsement proved more elusive. In a press release dated January 5, 2000, the Attorney General stated that he did "not oppose *in principle* Empire's wish to convert," but was "legally bound to protect the public interest when an organization that has enjoyed millions in state subsidies seeks to change its mission to earning profits for private owners" (*see* Statement by Attorney General Eliot Spitzer Regarding the Proposed Empire Blue Cross/Blue Shield Conversion, <http://www.oag.state.ny.us/press/2000/jan/jan05b_00.html> [last updated Jan. 24, 2003], cached at <http://www.courts.state.ny.us/reporter/webdocs/spitzers_statement_

---

7. In 1999, article 43 of the Insurance Law, the article under which Empire operated, provided at section 4301 (j) that

"[n]o medical expense indemnity corporation, dental expense indemnity corporation, health service corporation, or hospital service corporation shall be converted into a corporation organized for pecuniary profit. Every such corporation shall be maintained and operated for the benefit of its members and subscribers as a co-operative corporation."

Section 7301 of the Insurance Law specifies that "[n]o insurer organized or licensed under this chapter shall convert to a different type of insurer except as provided in this article."

bluecross_conversion.htm> [emphasis added]). He then identified several objections to the restructuring plan approved by the Superintendent, first and foremost the legal bar of Insurance Law § 4301 (j).[8] In the end, Empire elected not to pursue reorganization under the 1999 restructuring plan approved by the Superintendent.

### Health Care Workforce Recruitment and Retention Act

On January 25, 2002, the Legislature enacted Chapter 1 of the Laws of 2002, the Health Care Workforce Recruitment and Retention Act (Chapter 1). Chapter 1's purposes include "allow-[ing] [Empire] to convert to a for-profit corporation, giving Empire the ability to raise the capital needed to compete effectively in the current health care market"; providing revenue from the conversion "to help health care providers recruit and retain the staff they need"; and "increas[ing] and improv[ing] health care access for children, women and the working disabled" (Senate Mem in Support of L 2002, ch 1, 2002 McKinney's Session Laws of NY, at 1639-1640).

Chapter 1 amends Insurance Law § 4301 (j) by adding five new paragraphs, including paragraph (2) specifically addressing the Attorney General's contention that this provision would otherwise preclude Empire's conversion.[9] Chapter 1 also creates a new section 7317 of the Insurance Law, which directs Empire to submit a proposed plan of conversion (Insurance Law § 7317 [a] [1]) and prohibits the Superintendent from approving this plan until after he has convened public hearings and determined that it

> "[would] not adversely affect the applicant's contractholders or members, [would] protect the interests of and [would] not negatively impact on

---

**8.** The Attorney General's other principal objections were "old" Empire's continued control over the charitable foundation receiving the not-for-profit assets; whether the foundation would receive fair value under such control; and whether "old" Empire's continued control over "new" Empire would compromise an arm's length valuation of the conversion.

**9.** Insurance Law § 4301 (j) (2) now provides that
> "[a]n article forty-three corporation which was the subject of an initial opinion and decision issued by the superintendent on or before December thirty-first, nineteen hundred ninety-nine, as the same may be amended, may be converted into a corporation or other entity organized for pecuniary profit, or into a for-profit organization, in any such case, in accordance with the provisions of section [7317] of this chapter."

the delivery of health care benefits and services to the people of the state of New York and results in the fair, equitable and convenient winding down of the business and affairs of the applicant" (Insurance Law § 7317 [b]).

Section 7317 (f) (i) vests Supreme Court with sole jurisdiction to consider any challenge to the Superintendent's final determination to approve the conversion, sets a 30-day limitations period, and limits judicial review to the question of whether the Superintendent acted in an arbitrary or capricious manner with respect to reaching his determination.

Section 7317 (f) (ii) specifies that "[t]his section [7317] shall be deemed to supercede all otherwise applicable laws and legal requirements" and grants Empire's Board immunity for participation in the conversion.[10] Section 7317 (f) (ii) additionally provides that

"a transaction approved by the superintendent shall be deemed for all purposes to be a transaction that is fair and reasonable to an applicant and to promote the purposes of that applicant, and the use of proceeds as described herein shall be deemed for all purposes to be a use for a purpose that is consistent with and as near as may be to the purposes for which the applicant was originally organized and subsequently operated."

The plan of conversion submitted by Empire pursuant to Chapter 1 was similar in many ways to the plan approved by the Superintendent in 1999. This plan accomplishes Empire's conversion through a transfer of assets, the creation of new for-profit corporations and a holding company, and a stock sale. Chapter 1 modifies Empire's original plan in one key respect, however. Rather than dedicating 100% of the assets freed upon conversion to a charitable foundation, Chapter 1 calls for 95% of the fair market value of the for-profit entity to be transferred

---

**10.** Specifically, section 7317 (f) (ii) states that

"compliance with this section and subsection (j) of section four thousand three hundred one of this chapter and the use of such funds as provided in such section, and in subsection (k) of this section, shall be deemed to constitute compliance with and shall supercede all such other legal requirements, including, but not limited to, statutory, common law and any other requirements relating to not-for-profit corporations and fiduciary requirements applicable to the board of directors of any company filing a plan pursuant to this section."

to a "public asset fund" (Insurance Law § 4301 [j] [4]; § 7317 [e]). The remaining 5% is to be transferred to a "charitable organization" (Insurance Law § 4301 [j] [5]; § 7317 [k] [1]) that shall operate as a tax-exempt organization pursuant to IRC § 501 (c) (3) and whose mission is expansion of access to health care generally.[11]

The public asset fund is to be managed by a board of directors consisting of five members, three appointed by the Governor and one each appointed by the Temporary President of the Senate and the Speaker of the Assembly (Insurance Law § 4301 [j] [4] [B]). The net proceeds in the fund are to be transferred to the preexisting Tobacco Control and Insurance Initiatives Pool (Insurance Law § 4301 [j] [4] [O]; *see also* Public Health Law § 2807-v). Chapter 1 directs that the funds be used for recruiting and retaining nonsupervisory health care workers with direct patient care responsibilities (L 2002, ch 1, part A, §§ 1, 1-b, 2, 7-b); the Elderly Pharmaceutical Insurance Coverage (EPIC) program, a state-sponsored prescription plan for needy senior citizens (*id.* § 29); treatment for breast and cervical cancer (*id.* § 60); Medicaid for disabled persons (*id.* § 69); quality improvement programs for nursing homes (*id.* §§ 5, 26); and assistance for other public health programs.[12] Any residual funds would go to the previously created Health Care Initiatives Pool (Public Health Law § 2807-*l*) and be distributed proportionally among its purposes (L 2002, ch 1, part A, § 23). These purposes include programs benefitting uninsured and underinsured chil-

---

11. The Charitable Asset Foundation's mission is stated to be the

"(A) expansion of access to health care by extending health insurance coverage to state residents who cannot afford to purchase their own coverage or who have coverage that is inadequate to meet their needs;

"(B) expansion and enhancement of access to health care by augmenting and creating health care programs that deliver services to populations that are unable to access health care or that improve public health; and

"(C) augmentation of its other program priorities by supporting programs that inform and educate New Yorkers about public health issues and empower communities to address these issues by becoming more effective at identifying and articulating health care needs and implementing solutions.

"Programs or initiatives instituted by the charitable organization shall not neglect the residents or institutions served by the applicant prior to the conversion" (Insurance Law § 7317 [k] [3]).

12. By our estimation, roughly 65% of the funds from Empire's conversion were directed over three years to employee recruitment and retention.

dren (Child Health Plus), and expanded and catastrophic health care programs, as well as rural health care delivery and access programs (*see* Public Health Law § 2807-*l* [1]).

## II.

On August 20, 2002, plaintiffs filed a complaint in Supreme Court challenging Chapter 1. Plaintiffs include Empire subscribers whose premiums and benefits will allegedly be adversely affected by the conversion, and organizations that work with chronically ill individuals whose work will allegedly be made more difficult when Empire's assets are no longer dedicated to not-for-profit purposes. The defendants include the State and various of its entities, and Empire, including the members of its Board.

The complaint consists of eight[13] causes of action. Plaintiffs allege that Chapter 1 violates the Due Process Clause of article I, § 6 of the State Constitution and the Contract Clause of article I, § 10 of the Federal Constitution; Chapter 1 deprives plaintiffs and Empire of property rights without due process of law; Chapter 1 effects an unauthorized taking of Empire's and plaintiffs' private property interests in violation of article I, § 7 of the State Constitution and the Fifth and Fourteenth Amendments of the Federal Constitution; the conversion is invalid because the members of Empire's Board failed to follow the procedures in the Not-For-Profit Corporation Law; and the members of Empire's Board breached their fiduciary duties by agreeing to the conversion authorized by Chapter 1.[14] The supposition common to these causes of action—the heart of

---

**13.** Plaintiffs subsequently withdrew a ninth cause of action, which alleged that Empire does not qualify to convert under the terms of Chapter 1. The relief sought by plaintiffs on this cause of action was a declaration that Chapter 1 does not permit Empire's conversion.

**14.** Plaintiffs also alleged a violation of 42 USC § 1983, and requested a constructive trust (purportedly a cause of action). Section 1983 is a vehicle for enforcing constitutional rights, which presupposes state action (*see Tancredi v Metropolitan Life Ins. Co.*, 316 F3d 308 [2d Cir 2003] [no state action where a state-chartered mutual life insurance company reorganizes into a domestic stock life insurer under provisions of the Insurance Law]). Even if there were state action, plaintiffs' section 1983 claim rises or falls with its constitutional claims. Further, a constructive trust is only imposed upon a finding of "(1) a confidential or fiduciary relation, (2) a promise, express or implied, (3) a transfer made in reliance on that promise, and (4) unjust enrichment" (*Bankers Sec. Life Ins. Socy. v Shakerdge*, 49 NY2d 939, 940 [1980]). Plaintiffs did not allege any of this in the original complaint, and did not renew their request for a constructive trust in their amended complaint.

plaintiffs' grievance—is that assets from the restructuring are not going to be used to further Empire's historic charitable purposes.

Plaintiffs sought judgment declaring that Chapter 1 violates the state and federal constitutions and enjoining defendants "from taking any action to carry out the unconstitutional directives of the Legislation"; declaring that the members of Empire's Board breached their fiduciary duty; and enjoining the Board from proceeding with any conversion or other disposition of assets without complying with the Not-For-Profit Corporation Law. Plaintiffs summarized the relief sought as "a permanent injunction prohibiting the conversion or, in the alternative, requiring all conversion proceeds to be paid to a foundation that will carry on Empire's charitable mission."

This lawsuit and Empire's conversion progressed along parallel paths. Empire submitted the new required plan to the Superintendent in June 2002; in this litigation, Empire and the State filed pre-answer motions to dismiss. In October 2002, the Superintendent approved the plan, and plaintiffs filed their opposition to the motions. In November 2002, plaintiffs requested provisional relief directing that any proceeds from the stock sale be held by the Comptroller in a separate account during the litigation's pendency;[15] they did not seek to block the stock sale, which took place on November 8, 2002.[16] Supreme Court granted plaintiffs the provisional relief that they requested.

On February 28, 2003, Supreme Court granted defendants' motions to dismiss the complaint in its entirety. Preliminarily, the court determined that plaintiffs, who were subscribers to Empire health plans,[17] had demonstrated a threatened injury in fact (anticipated premium increases) and therefore had stand-

---

**15.** In November 2002, plaintiffs also commenced a CPLR article 78 proceeding to contest the Superintendent's final determination approving Empire's plan. Plaintiffs disputed only the distribution to the public asset fund of 100% of the proceeds from a judgment that Empire obtained against seven tobacco companies, arguing that 5% of these proceeds should have been distributed to the charitable organization. They did not contest any other aspect of the Superintendent's final determination, including his conclusion that conversion would not adversely affect subscribers' premiums or benefits.

**16.** WellChoice, the holding company for Empire, raised $417.5 million in the stock market on the IPO's first day. About 16.7 million shares, or 20.3% of the company's stock, were sold at an initial price of $25, valuing the company at about $2 billion (Freudenheim, *Judge Freezes Proceeds Raised from Health Insurer's Stock Sale*, New York Times, Nov. 9, 2002, at C14).

**17.** These subscriber plaintiffs include Consumers Union of U.S., Inc., which held a group subscriber contract, and five individuals.

ing. Conversely, the court concluded that organizational plaintiffs did not have standing either because their supposed injury in fact was too speculative, or because the interests that they sought to assert were not germane to their organizational purposes.

Supreme Court dismissed plaintiffs' claim against the State for impairment of contract "for the self-evident reason that there can be no impairment of a contract absent a contractual relationship" (citing *Ballentine v Koch*, 89 NY2d 51 [1996] [benefit program authorized by statute does not involve contract rights]). The court dismissed plaintiffs' due process claim against the State on the ground that statutes "are always vulnerable to subsequent statutory amendment or repeal," and that the alterations here did not amount to a deprivation of due process; and dismissed the takings claims because, "[e]ven if it is assumed, without deciding, that plaintiffs have a property interest in Empire's assets (a highly dubious assumption), the claims . . . must fail because the Statute does not require Empire to convert" (citing *Meriden Trust & Safe Deposit Co. v Federal Deposit Ins. Corp.*, 62 F3d 449, 455 [2d Cir 1995] [where a company "voluntarily subject(s) itself to a known obligation . . . no unconstitutional taking occur(s)"]). In addition, the court dismissed plaintiffs' claims against Empire alleging violation of the Not-For-Profit Corporation Law and breach of fiduciary duty, noting that Chapter 1 "supersedes all inconsistent common-law and statutory duties" (*see* Insurance Law § 7317 [f] [ii]).

Supreme Court, however, also concluded that the facts alleged "clearly suffice to support a cause of action for violation of Article III, § 17 (unnumbered subsection 12) of the State Constitution," the Exclusive Privileges Clause. Accordingly, the court granted plaintiffs permission to serve an amended complaint and left the restraining order in effect.

The amended complaint, filed on March 31, 2003, alleges only that the Legislature violated article III, § 17 of the State Constitution "by specifically applying to and granting the privilege of conversion to only . . . Empire."[18] This time around, plaintiffs sought judgment declaring that Chapter 1 was unconstitutional; declaring that the conversion already undertaken was illegal

---

18. The amended complaint also added the New York Charitable Asset Foundation, the charitable organization authorized by Chapter 1 (Insurance Law § 7317 [k]), as a defendant.

and requesting rescission of the stock sale; enjoining defendants from "taking any further action to carry out the unconstitutional directives of the Legislation"; enjoining the Board from proceeding with any conversion or other disposition of assets without complying with the Not-For-Profit Corporation Law; and directing the Comptroller to "return all proceeds received from Empire as a result of its conversion . . . to the owners of shares of Empire, proportional to the number of shares owned."

In April 2003, defendants moved to dismiss the amended complaint. On October 2, 2003, Supreme Court granted Empire's unopposed motion to dismiss with respect to the individual members of its Board, but denied the motions with respect to the State and Empire, and denied the motion to vacate the temporary restraining order. The Court held that Chapter 1 violates article III, § 17 of the State Constitution by giving Empire a right otherwise denied to other not-for-profit insurers; that is, the right to convert under Insurance Law § 4301 (j) (1). The parties cross-appealed and the Appellate Division unanimously affirmed both orders. Upon the parties' application, the Appellate Division granted leave to appeal and certified to us the question of whether its decision and order affirming Supreme Court's orders was properly made.

### III.

### Plaintiffs' Standing

Plaintiffs' claims fall into two distinct categories for purposes of analyzing standing: that Empire's Board violated fiduciary duties and the Not-For-Profit Corporation Law; and that Chapter 1 violates individual constitutional rights (property, contract and due process rights).[19] Plaintiffs have standing to assert these claims only if they have "a sufficiently cognizable stake in the outcome so as to cast[ ] the dispute in a form traditionally capable of judicial resolution" (*Community Bd. 7 of Borough of Manhattan v Schaffer*, 84 NY2d 148, 155 [1994] [citations and internal quotation marks omitted]).

Plaintiffs are not within any of the classes of parties authorized by the Not-For-Profit Corporation Law to challenge

---

**19.** None of the defendants challenged plaintiffs' standing to bring the amended complaint, which alleges only violation of New York Constitution, article III, § 17.

the Board's conduct (*see* N-PCL 720 [b]).[20] Consequently, they rely on *Alco Gravure, Inc. v Knapp Found.* (64 NY2d 458 [1985]) for standing to press their claims against Empire. There, a foundation was established as a New York not-for-profit corporation with the purpose of aiding employees of businesses associated with Joseph P. Knapp. The foundation's trustees sought to amend the certificate of incorporation to promote a broader range of charitable purposes so that they could transfer the foundation's assets to a North Carolina foundation, which did not assist individuals and was tax-exempt. The Attorney General did not object to this amendment; Supreme Court approved it.

Alco Gravure's New York employees sued the foundation seeking to enjoin the transfer. We found standing by applying principles of trust law, noting that while a "possible beneficiary of a charitable trust" does not normally have standing to sue for enforcement of the trust (only the Attorney General does), this general rule may yield where "a particular group of people has a special interest in funds held for a charitable purpose, as when they are entitled to a preference in the distribution of such funds and the class of potential beneficiaries is sharply defined and limited in number" (*id.* at 465). The *Alco Gravure* plaintiffs had standing because, as employees of a Knapp company, they remained the primary beneficiaries of the foundation's charitable purposes and so could seek to stop the foundation from adding new beneficiaries.

Here, the mission ascribed to Empire by plaintiffs—"high quality, affordable care for as much of the population as possible"—inures to the public as a whole, not to a "particular group of people" with a "special interest in funds held for a charitable purpose." As subscribers to Empire's health plans, plaintiffs cannot and do not claim that they have any greater right to Empire's assets than the public as a whole. Plaintiffs are not comparable to Alco Gravure's New York employees, who were beneficiaries of a private trust as potential recipients of loans from the foundation. Plaintiffs are merely purchasers of health insurance, parties to a commercial transaction with Empire.

---

**20.** Under N-PCL 720 (b), an action concerning transfer of the corporation's assets may be brought by the Attorney General, by the corporation or, in the right of the corporation, by a director or officer; receiver, trustee in bankruptcy, or judgment creditor; member; or holder of a subvention certificate or any other contributor to the corporation of cash or property of the value of $1,000 or more.

■ Next, plaintiffs' standing to enforce alleged violations of their individual constitutional rights cannot be taxpayer-based as they do not complain that public funds have been misused. Standing under *Alco Gravure* is unavailable to them because their constitutional claims are directed not at the not-for-profit corporation, but at Chapter 1 and the government's alleged violation of their constitutional rights. Standing to assert these claims is completely intertwined with the nature of the rights supposedly violated.

■ The only property right that plaintiffs assert is "dedication of Empire's assets to its charitable mission." Plaintiffs, either as subscribers to Empire's health plans or as members of the public as a whole, however, do not have an enforceable "property interest" in the value of Empire's assets or in the dedication of those assets to Empire's mission (*see Soon Duck Kim v City of New York*, 90 NY2d 1, 6 [1997] ["Because the State defines the rights and obligations that constitute property in the absence of any superseding Federal law, the threshold step in a takings inquiry is to determine whether, in light of the existing rules or understandings of State law, plaintiffs *ever* possessed the property interest they now claim has been taken by the challenged governmental action" (citation and internal quotation marks omitted)]; *see also Board of Regents of State Colleges v Roth*, 408 US 564, 577 [1972] ["To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it"]). Without a property interest to enforce, there can be no standing (*see Society of Plastics Indus. v County of Suffolk*, 77 NY2d 761, 772, 773 [1991] [standing requires injury in fact, "an actual legal stake in the matter being adjudicated," as well as an injury within the zone of interests, "tying the in-fact injury asserted to the governmental act challenged"]).

■ Further, plaintiffs have not established injury in fact on account of an anticipated increase in their premiums or reduction in benefits. This supposed injury is flatly contradicted in the Superintendent's final determination, and plaintiffs chose not to challenge this aspect of his determination in their CPLR article 78 proceeding. Even assuming injury in fact, plaintiffs have not linked this purported injury (i.e., increased premiums and/or reduced benefits) to the wrong that they seek to redress—the Legislature's neglect to "dedicat[e] . . . Empire's

assets to its charitable mission"—or the "principal remedy" that they seek to right this supposed wrong—implementation of Empire's original restructuring plan (i.e., directing 100% of Empire's value to a tax-exempt, IRC § 501 [c] [3] charitable foundation). If anything, this alleged injury could only arguably (that is, again ignoring the Superintendent's final determination) be connected to the Legislature's authorization of Empire's changeover from a not-for-profit to a for-profit insurer, not the disposition of the conversion's proceeds. Plaintiffs, however, do not contest Empire's change in corporate form.

In fact, what plaintiffs actually seek here is quasi-derivative standing to vindicate *Empire*'s interests. They argue that Chapter 1 has disabled both the Attorney General, the traditional guardian of the public interest and trust beneficiaries, and the Board, which has a duty of obedience to honor Empire's not-for-profit mission, from fulfilling their customary roles. The Attorney General, they assert, has been "defrocked" by virtue of his statutory obligation to defend the Legislature's enactments. Because the statute immunized its actions, the Board has no incentive to jeopardize conversion by questioning whether Chapter 1 diverts Empire's property from its traditional not-for-profit purposes. As a consequence, only the subscribers remain to champion Empire.

■ This argument is winning. *Alco Gravure* in its particulars does not support plaintiffs' standing, as already discussed. Still, we recognized in *Alco Gravure* that there may be "special interest" factors causing us to relax the usual rules of standing in a specific case where a charitable interest is involved (64 NY2d at 465).[21] The Attorney General's and the Board's disability are special interest factors here. Further, while plaintiffs are not true beneficiaries, as subscribers they benefit from whatever vestiges may remain from Empire's traditional role as the "insurer of last resort" for those New Yorkers otherwise unable to obtain needed health care. Nor can we ignore the billions of

---

21.  *Compare* Goldschmid, *The Fiduciary Duties of Nonprofit Directors and Officers: Paradoxes, Problems, and Proposed Reforms*, 23 J Corp L 631 (1998) (suggesting cautiously opening the door for donor, member and beneficiary derivative actions, especially to challenge conversions, which are likely to be one-shot, decisive transactions in the life of a nonprofit entity), *with* Atkinson, *Unsettled Standing: Who (Else) Should Enforce the Duties of Charitable Fiduciaries?*, 23 J Corp L 655 (1998) (pointing out conceptual flaws and practical problems with theories for broadening standing to enforce the duties of charitable fiduciaries); *see also* Blasko and Crossley, *Standing to Sue in the Charitable Sector*, 28 USF L Rev 37 (1993).

dollars at stake. Accordingly, because of the Attorney General's and the Board's unique position after the adoption of Chapter 1, we hold that plaintiff subscribers have standing to prosecute this action solely for purposes of protecting Empire's not-for-profit assets.

## Takings

Plaintiffs invoke both article I, § 7 (a) of the State Constitution ("[p]rivate property shall not be taken for public use without just compensation") and the Fifth Amendment to the Federal Constitution ("nor shall private property be taken for public use, without just compensation") to support their claims that Chapter 1 constitutes an illegal taking of Empire's private property. They allege that Chapter 1 effected an exaction, a regulatory taking and a per se taking.

### 1. Exaction

In *Matter of Smith v Town of Mendon* (4 NY3d 1, 10 [2004]), we held that "[e]xactions are defined as land-use decisions conditioning approval of development on the *dedication of property to public use*" (citations and internal quotation marks omitted). A condition placed on land use is an exaction, and therefore an unconstitutional taking, if the condition lacks an "essential nexus" with the state interest for which it is imposed (*see Nollan v California Coastal Comm'n*, 483 US 825, 837 [1987]), and is not "rough[ly] proportional[ ]" to the impact of the proposed development (*see Dolan v City of Tigard*, 512 US 374, 391 [1994]).

In *Town of Mendon*, we rejected the petitioners' claim that the Planning Board's conditioning of site plan approval upon acceptance of a conservation easement was an exaction. We did not reach the "essential nexus" and "rough proportionality" tests, deciding that exaction analysis does not apply "where there is no dedication of property to public use and the restriction merely places conditions on development" (4 NY3d at 12). We have confined our exaction analysis to those cases where the condition affects a property owner's "right to exclude others," and where a fee is imposed "in lieu of the physical dedication of property to public use" (*id.*, citing *Twin Lakes Dev. Corp. v Town of Monroe*, 1 NY3d 98 [2003]).

Plaintiffs ask us to find that Chapter 1 imposes an exaction on Empire because conversion is conditioned upon Empire's dedication of its not-for-profit assets to legislatively articulated

public and charitable purposes. We decline to accept plaintiffs' invitation to expand our exaction analysis beyond the realm of land-use regulation.[22] Even if we were to do so, however, Chapter 1 passes both the "essential nexus" and "rough proportionality" tests.

The challenged condition placed on Empire's property is the dedication of not-for-profit assets to the recruitment and retention of health care workers and public health programs. But Empire began as a captive of hospitals, and has always inhabited a borderland between a government-sponsored entitlement program, such as Medicaid, and a commercial insurer. Empire has traditionally functioned as both a financing device for hospitals and a means to make economical health care available to as many New Yorkers as possible. The dedication of conversion assets to support public health programs and to recruit and retain health care workers is wholly consistent with these activities. In short, there is not only a nexus but a direct correlation between the State's interest in enacting Chapter 1—allowing Empire to continue to carry out its dual historic mission—and the condition imposed—that Empire's not-for-profit assets be used for the public health purposes specified in Chapter 1.[23]

The "essential nexus" test does not mirror N-PCL 1005 (a) (3) (A), which calls for distribution of a Type B not-for-profit's assets upon dissolution to "one or more domestic or foreign corporations or other organizations *engaged in activities substantially similar to those of the dissolved corporation*"

---

**22.** Judge R.S. Smith in his dissent observes that "[n]othing in the Supreme Court's exactions decisions suggests that their rationale is limited to real property" (R.S. Smith dissenting in part op at 380). The Supreme Court, however, has never applied exactions analysis outside the context of land-use regulation. In its recent decision in *Lingle v Chevron U.S.A., Inc.* (544 US 528, —, —, 125 S Ct 2074, 2081, 2087 [2005]), the Court placed *Nollan* and *Dolan* in "the special context of land-use exactions," and referred to a "land-use exaction violating the standards set forth in *Nollan* and *Dolan*" as one of four distinct theories that might be pursued by a plaintiff seeking to challenge a government regulation as an uncompensated taking.

**23.** It is important to note that a far different property interest is at stake here than was the case in *Nollan* and *Dolan.* In those cases, the landowners were required to surrender their right to exclude others from their property— "one of the most essential sticks in the bundle of rights that are commonly characterized as property"—in exchange for land-use permits (*Nollan*, 483 US at 831 [internal quotation marks and citation omitted]). Here, Empire would be required to distribute its not-for-profit assets under any restructuring process, including the one outlined in N-PCL 1005 (a) (3) (A). Thus, this case entails Empire's more limited interest in ensuring that, upon conversion, its assets will be used in accordance with its historic mission.

(emphasis added) (*see also Matter of Multiple Sclerosis Serv. Org. of N.Y. [New York City Ch. of Natl. Multiple Sclerosis Socy.]*, 68 NY2d 32 [1986]).[24] This appeal is not here pursuant to N-PCL 511 and so section 1005's quasi cy pres test does not apply to Empire's conversion. In any event, it does not follow, as plaintiffs seem to assume, that under N-PCL 1005 Empire's not-for-profit assets would have to be distributed entirely to a tax-exempt, IRC § 501 (c) (3) charitable foundation. Indeed, another not-for-profit insurer arguably more nearly qualifies as an entity engaged in substantially similar activities. Although plaintiffs liken Empire to a "private charity" and refer to "donors," history does not bear out the analogy. Empire has never relied on philanthropy or carried out an explicitly charitable agenda. As already noted, Empire's former federal tax-exempt status was based on IRC § 501 (c) (4) as a social welfare organization. Empire was never a section 501 (c) (3) charity; Empire did not enroll subscribers for free.[25]

Finally, the condition is "roughly proportional" to the impact of Empire's conversion because if Empire were to convert

---

**24.** In *Multiple Sclerosis*, we interpreted this statutory standard as follows:

> "Under the quasi cy pres standard of the Not-For-Profit Corporation Law, a Supreme Court Justice in determining whether to approve the plan of distribution proposed by the corporation's board, and if not to what other charitable organizations distribution should be made, should consider (1) the source of the funds to be distributed, whether received through public subscription or under the trust provision of a will or other instrument; (2) the purposes and powers of the corporation as enumerated in its certificate of incorporation; (3) the activities in fact carried out and services actually provided by the corporation; (4) the relationship of the activities and purposes of the proposed distributee(s) to those of the dissolving corporation, and (5) the bases for the distribution recommended by the board" (68 NY2d at 35).

**25.** For the same reason that the Blues lost federal tax exemption—their activities do not differ fundamentally from those of commercial insurance companies—their conversions fit but awkwardly within the framework of charitable trust law (*see e.g. ABC for Health, Inc. v Commissioner of Ins.*, 250 Wis 2d 56, 640 NW2d 510 [2001], *review denied* 252 Wis 2d 149, 644 NW2d 686 [2002] [Wisconsin Blue Cross/Blue Shield organization not a charity to whose conversion cy pres doctrine applies because not operated exclusively for charitable purposes but for benefit of individuals who paid premiums to become policyholders]; *see also Abbott v Blue Cross & Blue Shield of Tex., Inc.*, 113 SW3d 753 [Tex Ct App, Austin 2003], *review denied* 2004 Tex LEXIS 1158 [2004] [Blue Cross and Blue Shield of Texas not a public charity that must preserve its assets for charitable purposes because corporation provided for group hospital plans for benefit of its members who purchased services, not for general charitable purposes]).

through any other mechanism—i.e., the Not-For-Profit Corporation Law—it would be required to dedicate its not-for-profit assets to purposes similar to those for which it was formed—i.e., promoting hospitals and access to health care. Thus, Chapter 1 places conditions on Empire's property similar to those that could have been imposed in the sale of its assets and dissolution under the Not-For-Profit Corporation Law.

2. Regulatory Taking

Governmental regulation of private property effects a taking if it is "so onerous that its effect is tantamount to a direct appropriation or ouster" (*see Lingle*, 544 US at —, 125 S Ct at 2081). To determine whether a regulation is proper or goes "too far," a court must consider the factors identified in *Penn Central Transp. Co. v New York City* (438 US 104 [1978]; *see Lingle*, 544 US at —, 125 S Ct at 2085 [holding, for the first time, that the "substantially advance legitimate state interests" test identified in *Agins v City of Tiburon* (447 US 255, 260 [1980]) "is not a valid method of identifying regulatory takings"]). The primary, but not exclusive *Penn Central* inquiry turns on "the extent to which the regulation has interfered with distinct investment-backed expectations" (544 US at —, 125 S Ct at 2082 [quoting *Penn Central*, 438 US at 124]).

■ First, we note that the compulsion normally present in takings claims is not present in Chapter 1. Chapter 1 does not compel Empire to convert. Rather, Chapter 1 authorizes Empire to convert; conversion only takes place if Empire so chooses (*see Meriden Trust*, 62 F3d at 455 [voluntary action by bank under statute cannot be a regulatory taking]; *Garelick v Sullivan*, 987 F2d 913, 916 [2d Cir 1993] ["where a service provider voluntarily participates in a price-regulated program or activity, there is no legal compulsion to provide service and thus there can be no [regulatory] taking"]).[26]

Plaintiffs contend that Empire had no true choice in the matter, that conversion under Chapter 1 was compelled because it

---

**26.** Plaintiffs' reliance on *Illinois Clean Energy Community Found. v Filan* (392 F3d 934 [7th Cir 2004] [*ICECF*]) is misplaced. There, Illinois authorized a $4.8 billion sale of Commonwealth Edison's power plants so long as the utility agreed to fund a new energy conservation foundation with $225 million from the sale's proceeds. Later, after the foundation had been established, the State Legislature amended the authorizing statute to require that the *foundation* give $125 million of its assets to the State. The Seventh Circuit found this a taking of the foundation's property. In *ICECF*, the foundation sued over legislation which was retroactively amended to require it to turn assets over to the State. Here, on the other hand, Empire was given the

was Empire's only realistic option for survival. But any duress stemmed from Empire's inability to prosper as a not-for-profit organization, not from pressure exerted by the State. From at least as early as 1997, Empire planned to convert, merge or dissolve.

In any event, Chapter 1 does not unduly interfere with Empire's legitimate property interests. As we noted in our exaction discussion, the dedication of conversion assets to support public health programs and to recruit and retain health care workers is wholly consistent with Empire's historic mission. Chapter 1 allows Empire to continue as a for-profit corporation, placing it in a better competitive position than otherwise would have been its lot. Since Empire's Board has determined that the most feasible way of continuing as a provider of health insurance in New York is through restructuring, it cannot be said that Chapter 1's dedication of Empire's not-for-profit assets to public health purposes unduly interferes with Empire's legitimate property interests or "investment-backed expectations."

3. Per Se Taking

■ Plaintiffs allege that the transfer of the stock sale's proceeds to the public asset fund constitutes a per se taking because it is a "direct physical invasion" of Empire's property (see Loretto v Teleprompter Manhattan CATV Corp., 458 US 419, 426 [1982]). This claim is without merit. There can be no direct physical invasion where a corporation voluntarily elects to proceed under a statute allowing it to convert from a financially distressed not-for-profit to a new for-profit entity.

## Due Process

Plaintiffs allege that Chapter 1 deprives Empire of its property interests without due process of law. This claim is based on article I, § 6 of the State Constitution and the Fifth Amendment of the Federal Constitution, made applicable to the states by the Fourteenth Amendment, which provide that no person shall "be deprived of life, liberty, or property, without due process of law."

■ Plaintiffs contend that process is lacking because Chapter 1's procedural safeguards do not encompass any input from the public, the Attorney General or Supreme Court into how Empire's not-for-profit assets are to be deployed. To the contrary, however, Chapter 1 provides Empire with process and

choice to convert, knowing that if it did, Chapter 1 directs that its not-for-profit assets will be used for public health purposes.

plaintiffs with a remedy to grieve many of the Superintendent's determinations.

First, Empire had to choose to proceed with the conversion. Second, public hearings were required. Third, the Superintendent could only approve the conversion if he first determined that it would not adversely affect Empire's subscribers or "the delivery of health care benefits and services to the people of the state of New York" (Insurance Law § 7317 [b]). Finally, if plaintiffs took issue with the Superintendent's approval of the plan, they had the right to challenge it in a CPLR article 78 proceeding.

### Contract Clause

Plaintiffs contend that Chapter 1 violates article I, § 10 (1) of the Federal Constitution, which provides that "[n]o State shall . . . pass any . . . Law impairing the Obligation of Contracts." This provision "bars the States from enacting legislation impairing the obligation of contracts" (*Patterson v Carey*, 41 NY2d 714, 721 [1977]). Plaintiffs also bring this claim under article I, § 6 of the New York Constitution, which provides that "[n]o person shall be deprived of life, liberty or property without due process of law." Under this provision "the State may not deprive a party to a contract of an essential contractual attribute without due process of law" (41 NY2d at 720).

Plaintiffs assert that Empire's certificate of incorporation (COI) is a contract between Empire and the public, and that this contract was substantially impaired by Chapter 1. The COI is not a contract (*see Cook v City of Binghamton*, 48 NY2d 323 [1979] [while legislation (i.e., N-PCL 403, providing that corporate existence begins with filing of COI) may create contractual rights, presumption is that it does not]). There is no indication that the Legislature, in enacting the Not-For-Profit Corporation Law, intended to make the COI a binding contract between not-for-profit corporations and the public. "[W]here there is no existing contractual agreement regarding the terms changed by the legislation, there is no need to consider whether there was in fact an impairment and whether it was substantial" (*Ballentine*, 89 NY2d at 60).

Chapter 1 does not impair the COI. A COI may be changed in any number of ways (*see* N-PCL 801 [b] [2] [allowing corporation to change its corporate purposes]; NY Const, art X, § 1 [giving Legislature authority to change laws under which corporations are formed]). Chapter 1 did not change the COI; actions

by Empire and the Superintendent changed the COI. Moreover, plaintiffs do not challenge the only "impairment" that results from Chapter 1; namely, Empire's conversion from not-for-profit to for-profit status. As a not-for-profit corporation, Empire was bound to carry out its not-for-profit purposes, but these purposes do not constitute a contract that Chapter 1 impairs.

## Fiduciary Duty/N-PCL

Plaintiffs broadly allege that notwithstanding Chapter 1, the conversion was required to follow the procedures in N-PCL 510 and 511. They also contend that Empire's Board breached its fiduciary duty by deciding to convert. Indeed, plaintiffs allege that even before Chapter 1 was enacted, the Board breached its fiduciary duty by "invit[ing] the politician-legislators" to decide how its assets should be used after the conversion rather than making its own determination.

The short response to this claim is that Chapter 1 supersedes all inconsistent common-law and statutory duties (Insurance Law § 7317 [f] [ii]). Even were the Court to somehow overcome this obstacle, the business judgment rule, which we discussed most recently in *40 W. 67th St. v Pullman* (100 NY2d 147 [2003]), bars plaintiffs' claims. To the extent that plaintiffs complain about action occurring before Chapter 1 was enacted (i.e., "inviting" the Legislature to decide how to allocate Empire's not-for-profit assets), this claim is without merit because the plan of conversion—whether the one presented to the Superintendent in 1999 or the one presented to him after Chapter 1's enactment—was, in the Board's judgment, necessary to safeguard Empire's continued viability (*see Auerbach v Bennett*, 47 NY2d 619, 629 [1979] [the business judgment rule "bars judicial inquiry into actions of corporate directors taken in good faith and in the exercise of honest judgment in the lawful and legitimate furtherance of corporate purposes"]).

## Exclusive Privileges Clause

Plaintiffs argue that Chapter 1 violates article III, § 17 of the State Constitution by authorizing Empire alone to convert to a for-profit corporation. Article III, § 17 prohibits the Legislature from adopting a "private or local bill" falling into 1 of 14 specified categories. The twelfth category encompasses bills "[g]ranting to any private corporation . . . any exclusive privilege, immunity or franchise whatever." Thus, two elements are required in order for a bill to offend article III, § 17. First, the bill must

be directed at a single entity (*see Matter of Henneberger*, 155 NY 420, 425-426 [1898] ["the fact that an act operates only upon a limited area, or upon persons within a specified locality and not generally throughout the state, is, in most cases, a reasonably accurate test by which to determine whether the act is general or local" (internal quotation marks omitted)]). Second, the bill must confer a privilege upon the single entity to the exclusion of all others. Both elements—singleness and exclusivity—must be present. Otherwise, all legislation directed at a single entity would be invalid.

▮ Chapter 1 is a "private or local bill" because it applies only to Empire. But Chapter 1 does not confer an exclusive privilege because it does not authorize Empire to prevent others from seeking to convert under similar parameters, or promise Empire that other not-for-profits will not be granted similar rights (*see Trustees of Exempt Firemen's Benevolent Fund of City of N.Y. v Roome*, 93 NY 313, 328 [1883] ["exclusive" means that the privilege the beneficiary receives from the local or private law would be "disturbed or invaded if the State should give to another corporation" the same rights]; *Matter of Union Ferry Co. of Brooklyn*, 98 NY 139, 150 [1885] ["The constitutional prohibition was evidently aimed at monopolies. At granting to corporations or individuals not merely privileges and franchises not possessed by others, but the right to exclude others from the exercise or enjoyment of like privileges or franchises"]).[27] Indeed, Chapter 1 only grants Empire the right to operate as a for-profit insurer, a right that numerous other insurers currently enjoy in New York, and which others may receive upon application to the Superintendent. Because the privilege granted to Empire is not exclusive, Chapter 1 does not violate article III, § 17.

## IV.

Plaintiffs do not challenge Empire's actual conversion from a not-for-profit to a for-profit corporation. Instead, they decry the uses to which the conversion's proceeds—Empire's not-for-profit assets—will be put. They particularly object to funding the recruitment and retention of health care workers. They warn that unless we rule in their favor, Chapter 1 will mark "but the

---

**27.** The 1938 Constitutional Convention expressly endorsed *Union Ferry*'s reasoning that the Exclusive Privileges Clause was aimed at monopolies (*see* 7 Report of 1938 NY Constitutional Convention Comm, Problems Relating to Legislative Organization and Powers, at 84).

first step in a progressive cannibalization of New York's non-profit sector" by the Legislature.[28] These strong words are justified, plaintiffs insist, because the Legislature, after neutralizing the Attorney General's and the Board's capacity or appetite to resist, ignored Empire's not-for-profit purposes when designating uses for Empire's not-for-profit assets.

■ We cannot agree. Even plaintiffs define Empire's mission as "promoting affordable and accessible health care coverage," a broad expression of purpose. Fidelity to this purpose does not mandate creation of a charitable foundation devoted to health care funded by the entirety of Empire's not-for-profit assets, plaintiffs' preferred policy choice. Fidelity to this purpose surely does not compel neglecting the needs of New York's hospitals. The hospitals and Empire have always played mutually supportive roles in our state's interrelated and complex health care delivery system. Specific programs to be funded with conversion proceeds—such as EPIC and Child Health Plus—benefit the uninsured or the underinsured. In short, Chapter 1 designates a range of public health-related uses that fall comfortably within a reasonable interpretation of Empire's historic not-for-profit mission.

Accordingly, the order of the Appellate Division should be modified, with costs to defendants, by granting defendants' motions to dismiss the amended complaint and, as so modified, affirmed. The certified question should be answered in the negative.

G.B. SMITH, J. (dissenting in part). I join in the dissent of Judge Robert Smith. In addition, because plaintiffs have stated a viable cause of action for breach of a fiduciary duty against the Board of Directors of Empire HealthChoice, Inc. doing business as Empire Blue Cross and Blue Shield (Empire), I dissent from the dismissal of that claim. Because not-for-profit directors that serve charitable entities and administer charitable as-

---

28. Although the language in Judge R.S. Smith's dissent is decidedly more tempered, it likewise tends to focus on a "parade of horribles" and hypothetical legislative abuses (e.g., legislation "compel[ling] the use of 95% of an art museum's money for prison construction" [R.S. Smith dissenting in part op at 377]) far removed from the facts of this case. As Justice Samuel Miller instructed in *United States v Lee* (106 US 196, 217 [1882]): "Hypothetical cases of great evils may be suggested by a particularly fruitful imagination in regard to almost every law upon which depends the rights of the individual or of the government, and if the existence of laws is to depend upon their capacity to withstand such criticism, the whole fabric of the law must fail."

sets (e.g., Empire's directors) are fiduciaries, and the fiduciary duties of care, loyalty and obedience govern the conduct of such not-for-profit directors, their fiduciary obligations are far too important to be superceded by statute without an adequate justification or explanation. I would therefore permit the plaintiffs to proceed on this claim.

## Facts

Background[1]

Empire was incorporated as a Type B corporation under the Not-For-Profit Corporation Law (N-PCL) and chartered under article 43 of the Insurance Law to provide affordable, prepaid hospital and medical services/insurance coverage to lower and middle income persons statewide. Empire endeavored to accomplish this mission through a combination of initial charitable funding, donations, subscription receipts, tax exemptions, reduced hospital rates, and private and governmental administrative contracts.

In the 1980's and 1990's, a number of events (i.e., the removal of Empire's favorable hospital reimbursement differential; revocation of Empire's tax exempt status [based on the United States General Accounting Office finding that Empire's underwriting practices were similar to those of commercial insurers]; and the fact that hospital and medical costs rose faster than approved subscription rates), and Empire's employment of community rating (a single premium applicable to all subscribers without regard for past medical history or projected use of medical resources) and open enrollment (guaranteed access to coverage) allowed commercial insurers, who could offer lower rates than Empire, to compete for and ultimately siphon off Empire's larger and healthier groups.[2] This increased competition from commercial insurers, coupled with the rapid growth of health management organizations

---

1. Because this controversy involves motions to dismiss for failure to state a cause of action (see CPLR 3211 [a] [7]), the court must assume the truth of the allegations in the pleading, "resolve all inferences which reasonably flow therefrom in favor of the pleader" (*Sanders v Winship*, 57 NY2d 391, 394 [1982]) and "determine . . . whether the facts alleged fit within any cognizable legal theory" (*Morone v Morone*, 50 NY2d 481, 484 [1980]).

2. Empire retained most of the individual and small group markets, which generally contained less healthy subscribers.

(HMOs), caused Empire to suffer a high rate of subscriber attrition.[3]

Between 1993 and 1997, the Legislature eliminated major distinctions between Empire and the commercial insurers with which it competed, requiring that insurers employ community rating and open enrollment and, as previously mentioned, eliminating the hospital reimbursement differential between not-for-profit insurers, like Empire, and commercial insurers. Although Empire started to recover, Empire's directors eventually concluded that it had to restructure as a for-profit corporation in order to remain viable.

In the late 1990's, Empire drafted a restructuring proposal to transform Empire into a newly-organized charitable foundation, funded by the sale of 100% of the stock of a new, for-profit Empire. Under this proposed plan, Empire would transfer its insurance, HMO, and other businesses and assets to two for-profit subsidiaries of Empire Health Care, Inc., a for-profit stock corporation that would be wholly owned by Empire. Empire would then sell a portion of its Empire Health Care, Inc. shares to the public, and Empire Health Care, Inc. would issue and sell new shares of its common stock. The proceeds of these sales, and any unsold shares of Empire Health Care, Inc.'s stock, would be transferred to the new charitable foundation and Empire would dissolve within two years of the plan's implementation.[4]

On December 29, 1999, after the proposed plan went through various revisions and was the subject of a number of Attorney General-sponsored public information sessions, the Superintendent of Insurance issued a final opinion and decision approving

---

3. From 1986 to 1995, Empire's net operating losses exceeded $800 million and its subscriber base dwindled from 10 million to less than 5 million.

4. On April 11, 1997, Ira M. Millstein, outside counsel to Empire, testified before the New York State Assembly Standing Committees on Insurance and Health regarding Empire's proposed restructuring plan in light of the responsibilities of Empire's directors, given the economic circumstances of the company and the changing competitive environment in which Empire operates. Millstein discussed at length the duties owed by Empire's directors (i.e., the duty of care, duty of loyalty and duty of obedience). However, regarding the duty of obedience, Mr. Millstein stated, "When the operating environment changes, such that continuing *status quo* operation is uneconomic, not for profit boards face a considerable challenge to protect assets and perpetuate the organization, while meeting the 'duty of obedience.' This is graphically demonstrated in the case of Empire" (Millstein Testimony at 10).

Millstein's testimony was given with the original restructuring plan in mind (100% of Empire's value to a charitable foundation).

the plan for the conversion of Empire into a for-profit corporation. The Superintendent approved the plan in spite of Insurance Law § 4301 (j) which, at that time, barred such conversions. The Superintendent argued that section 4301 (j) was not applicable to Empire's proposed conversion. However, the State Attorney General's Office, which from 1997 to 2001 considered and modified Empire's restructuring plan with a view towards preserving and protecting Empire's value as a charitable asset, disagreed with the Superintendent regarding whether the plan as approved was legal given the existing Insurance Law and N-PCL.

After the Attorney General raised questions as to the validity of the proposed restructuring plan under the existing law, Empire did not restructure under this plan. Instead, Empire sought the legislative changes necessary to effect the plan. This proposed legislation, however, met with strong opposition from two powerful organizations, the Greater New York Hospital Association (GNYHA) and the health and human service union (Local 1199), and initially was not passed.[5] Faced with what they termed "political stasis," Empire's Board of Directors, in August 2001, sent a letter to Governor Pataki, Senate Majority Leader Bruno and Speaker of the Assembly Silver (1) to seek the Legislature's assistance in getting the legislation passed; and (2) to ask the Legislature to substitute its judgment for that of Empire's Board of Directors in determining the disposition of Empire's assets.[6] Plaintiffs suggest that Empire received the assistance it wanted through some political maneuvering,

---

**5.** Plaintiffs alleged, upon information and belief, that GNYHA and Local 1199, in or about June 2001, agreed to drop their opposition to the plan in exchange for Empire's agreement that half of the funds realized would go to the proposed foundation (with the goal of increasing access to health care and coverage) while the other half would go to a foundation "supporting hospitals' purchases of 'new computer systems or information technology . . . [to] help eliminate medical errors.' "

**6.** The August 2001 letter provides, in pertinent part:

"We write to call your attention to the fact that failure to enact legislation this year, enabling the corporation to become a for-profit enterprise, will put the viability of Empire at risk—for no explicable reason beyond a political stasis. Failure to act also puts at risk the creation of a foundation worth $1 billion to be used for health care for New York residents.

"1. Empire has been engaged in the process of seeking to restructure as a for-profit company for five years. Empire's continued viability in a competitive market is compromised without the passage of this legislation. Similar legislation has been enacted in a number of other states, most recently New

i.e., they allege, upon information and belief, that representatives from Local 1199 and Governor Pataki, in or about November 2001, engaged in secret negotiations/discussions regarding how to use the majority of Empire's assets to fund a labor contract between the union and members of the GNYHA. Shortly thereafter, on or about January 24, 2002, the Governor proposed Chapter 1 of the Laws of 2002. Within a day of the Governor's proposal, the Legislature enacted Chapter 1 of the Laws of 2002.

Chapter 1 added five new paragraphs to Insurance Law § 4301 (j),[7] and created Insurance Law § 7317.[8] While Chapter 1 does not generally amend the law with respect to conversion of not-for-profit insurers, according to the bill sponsor's Memorandum

---

Jersey. Many other Blue Cross Plans including Connecticut Blue Cross have declared their intention to convert. . . .

"7. There is $1 billion of current value (Empire's worth) on the table ready to be placed in a foundation dedicated to health care, once the legislation is passed.

"8. *The only significant reason we can see for a delay at this point is an inability to agree on how to divide the foundation's income. This is not an issue Empire can resolve, only you can resolve it.* . . .

"10. If you cannot agree on how to divide the $1 billion in foundation proceeds, then let the legislation pass, create one or more foundations, and let the foundation boards make the decision.

"The opportunity to unlock $1 billion in value, to be put to public health care use for the people of New York, is something that should not be wasted." (Emphasis added.)

7. For example, Insurance Law § 4301 (j) (1), which sets forth the general rule that medical expense indemnity corporations may not convert to for-profit entities, provides that:

"[n]o medical expense indemnity corporation, dental expense indemnity corporation, health service corporation, or hospital service corporation shall be converted into a corporation organized for pecuniary profit. Every such corporation shall be maintained and operated for the benefit of its members and subscribers as a co-operative corporation."

However, an exception to the above rule is set forth in Insurance Law § 4301 (j) (2). Section 4301 (j) (2) provides that:

"[a]n article [43] corporation which was the subject of an initial opinion and decision issued by the superintendent [of insurance] on or before December [31, 1999], as the same may be amended, may be converted into a corporation or other entity organized for pecuniary profit, or into a for-profit organization, in any such case, in accordance with the provisions of section [7317] of this chapter."

8. For example, Insurance Law § 7317 (a) (1), which sets forth the requirements for the restructuring plan that must be submitted under Chapter 1, provides that:

in Support, one of the purposes of the bill was to "authorize the conversion of Empire Blue Cross to for-profit status."[9] (2002 McKinney's Cons Laws of NY, at 1635.)

Contrary to Empire's original restructuring plan, which called for the distribution of 100% of the value of Empire's assets towards charitable purposes, Chapter 1 would require that 95% of the value of Empire's stock be deemed a "public asset" and 5% a "charitable asset" (*see* Insurance Law § 4301 [j] [3], [5]).[10] Chapter 1 directs that the public asset be turned over to a public asset fund (*see* Insurance Law § 4301 [j] [4]; § 7317 [e]) managed by a five-person board appointed by the Governor, Temporary President of the Senate and the Speaker of the Assembly. The net proceeds of the public asset fund are transferred to the Director of the Budget for deposit into the Tobacco Control and Insurance Initiatives Pool.[11] On the other hand, Chapter 1 directs that the charitable asset (5% of Empire's total anticipated value) be turned over to a charitable organization/foundation (*see* Insurance Law § 4301 [j] [5]; § 7317 [k] [1]) governed by various political appointees.

On or about June 18, 2002, pursuant to Chapter 1, Empire filed an Amended Plan of Conversion with the New York Department of Insurance. Empire filed this Amended Plan knowing that the requirements pertaining to the allocation of its value

---

"[a]n article [43] corporation which was the subject of an initial opinion and decision issued by the superintendent on or before December [31, 1999], as the same may be amended, which seeks to convert into a corporation or other entity organized for pecuniary profit or into a for-profit organization of any kind shall submit a proposed plan of conversion to the superintendent for approval pursuant to this section."

Additionally, Chapter 1 supercedes statutory and common law relating to not-for-profit corporations, and fiduciary requirements applicable to the board of directors filing a plan pursuant to section 7317 (a) (1) (*see* Insurance Law § 7317 [f] [ii]).

9. Although the statute is written as applying generally, it has been acknowledged on a number of occasions, including in Supreme Court's February 2003 order, that this legislation was only meant to apply to Empire.

10. Chapter 1 provides for this value allocation even though both the Superintendent of Insurance and the Attorney General had previously recognized that Empire's entire value was a charitable asset.

11. Under Chapter 1, over $700 million, which represents about two thirds of the total anticipated value of Empire (and nearly 75% of the public asset fund), would be used to pay hospitals, nursing homes and certain personal care agencies in order to assist in the recruiting and retention of nonmanagerial health professionals over a three year period, i.e., the monies would be used to fund salaries and raises for these workers during that time.

under the Amended Plan (95% for public uses determined by the State and 5% for a charitable foundation) were drastically different than the allocation provided for in its original restructuring plan (100% for charitable uses).

Procedural History and Parties

On August 20, 2002, plaintiffs commenced the instant action in Supreme Court, New York County, against Empire and various New York State defendants (State defendants).[12] Plaintiffs asserted nine claims, including one for breach of fiduciary duty.[13] Regarding the cause of action for breach of fiduciary duty, plaintiffs alleged that, "Empire's Directors abdicated and breached their fiduciary duties of care, loyalty and obedience by[ ]: (i) abandoning the [original 1997] Restructuring Plan . . . ; (ii) asking the Legislature to substitute its judgment in determining the disposition of Empire's assets; and (iii) ignoring requests to exercise its fiduciary duty and instead simply acquiescing in the Legislature's taking of Empire's value for purposes other than carrying out Empire's mission."

On September 20, 2002, both Empire and the State defendants moved to dismiss plaintiffs' complaint in its entirety. By decision and order dated February 28, 2003 (and filed March 7, 2003), Supreme Court found that a number of the plaintiffs lacked standing. As to the remaining plaintiffs, Supreme Court granted defendants' motions and found that each cause of ac-

---

**12.** This action was commenced on behalf of: (1) Consumers Union of U.S., Inc. (CU); (2) National Multiple Sclerosis Society, New York City Chapter; (3) Housing Works, Inc.; (4) Disabled in Action of Metropolitan New York; (5) New York Statewide Senior Action Council, Inc.; (6) Jeffrey Friedwald; (7) Betty Sicher and Charles Sicher; (8) Carla Meyer; and (9) Alain Filiz. Of these plaintiffs, only CU and the individual plaintiffs have standing to sue. Their interests in this action follow. CU, which according to the complaint has a group subscriber contract with Empire, alleges that "[i]ncreased premiums or reduced benefit payments" resulting from the Empire conversion would increase CU's administrative costs. CU further alleges that this would harm both it and its employees who have elected Empire coverage. The individual plaintiffs (Friedwald, the Sichers, Meyer and Filiz) allege in the complaint that they "will be harmed when their premiums go up as a result of the conversion and Empire's assets are diverted from promoting greater accessibility and affordability of health coverage and care."

**13.** The causes of action consisted of (1) impairment of contract; (2) impairment of vested interests or property rights without due process of law; (3) unreasonable taking of private property for public use; (4) taking of property without just compensation; (5) deprivation of civil rights in violation of 42 USC § 1983; (6) a demand for a declaration that conversion is invalid for failure to comply with N-PCL 510, 511 and/or 1001 *et seq.*; (7) breach of fiduciary duty and enforcement of trust; (8) constructive trust; and (9) a demand for a declaration that Chapter 1 does not permit the instant conversion of Empire.

tion in the complaint failed to state a cause of action upon which relief could be granted.

Although it dismissed all claims asserted by plaintiffs against both Empire and State defendants, Supreme Court, on its own initiative, expressed the view that the "factual allegations in the complaint clearly suffice to support a cause of action for violation of Article III, § 17 (unnumbered subsection 12) of the State Constitution [i.e., the Exclusive Privileges Clause]." With leave of the court, plaintiffs filed an amended complaint, dated March 31, 2003, that alleged one violation of the Exclusive Privileges Clause. Empire and State defendants again moved to dismiss. By decision and order dated October 1, 2003 (and filed October 2, 2003), Supreme Court denied these motions.

On May 20, 2004, the Appellate Division, First Department affirmed: (1) the dismissal of plaintiffs' August 20, 2002 complaint; and (2) Supreme Court's decision to sustain plaintiffs' claim alleging a violation of the Exclusive Privileges Clause. The Appellate Division granted the plaintiffs and defendants leave to appeal.

## Discussion

Given the fact that not-for-profit organizations generate and spend billions of dollars, many not-for-profit boards and individual directors rival their for-profit counterparts in terms of influence exerted and power wielded. However, the checks on the power of not-for-profit and for-profit directors are quite different.[14] In New York, the State Attorney General's Office normally oversees the conduct of not-for-profit directors (*see* New York State Attorney General Charities Bureau, The Regulatory Role of the Attorney General's Charities Bureau, <http://www.oag.state.ny.us/charities/role.pdf>, cached at <http://www.courts.state.ny.us/reporter/webdocs/role.pdf>). However, in this case, regarding the instant transaction, the Attorney General's Office, which is also charged with defending the Legislature's enactments, has a conflict that prevents it from performing its oversight role.[15] Because of this unique situation, it is of paramount importance not only that standing be given to the plaintiffs (a conclusion reached by the majority), but also

**14.** For example, not-for-profit organizations and their directors are not subject to the disclosure requirements of the Securities and Exchange Commission.

**15.** In fact, the Attorney General has not commented one way or the other on plaintiffs' breach of fiduciary duty claim.

that not-for-profit directors adhere to their fiduciary duties and that fiduciary requirements, in general, be strictly enforced.

The fiduciary duties of care, loyalty and obedience are the legal standards that govern the conduct of not-for-profit boards and individual directors in their day-to-day relationship to the organizations they serve.[16] Specifically, N-PCL 717 (a) states in part, "Directors and officers shall discharge the duties of their

---

**16.** The Attorney General enforces the duties of care, loyalty and obedience (*see* The Regulatory Role of the Attorney General's Charities Bureau, at 3-4). Definitions of these duties are set forth below.

"1. The duty of care: The common law duty of care requires that the trustees, directors and officers of charitable organizations be attentive to the organization's activities and finances and actively oversee the way in which its assets are managed. This includes attending and participating in meetings, reading and understanding financial documents, ensuring that funds are properly managed, asking questions and exercising sound judgment. New York has codified the standard for the duty of care in N-PCL § 717, which provides that directors and officers of not-for-profit corporations 'shall discharge the duties of their respective positions in good faith and with the degree of diligence, care and skill which ordinarily prudent [persons] would exercise under similar circumstances in like positions.' *See also* EPTL §§ 11-1.7, 11-2.2 & 11-2.3.

"2. The duty of loyalty: The common law duty of loyalty requires trustees, directors and officers to pursue the interests and mission of the charitable organization with undivided allegiance. Private interests must not be placed above the charity's interests. The N-PCL addresses certain aspects of this duty. For example, the N-PCL requires directors and officers to act in 'good faith' (N-PCL § 717), contains an absolute prohibition against loans to directors and officers (N-PCL § 716) and contains restrictions on self-dealing transactions (N-PCL § 406 & 715), as does EPTL § 8-1.8.

"3. The duty of obedience: The common law duty of obedience includes the obligation of directors and officers to act within the organization's purposes and ensure that the corporation's mission is pursued. There is no explicit reference to the duty of obedience in the N-PCL. However, the duty may be inferred by the limitations imposed upon corporate activities as set forth in the purposes clause of the certificate of incorporation (N-PCL §§ 201, 202 & 402 (a) (2)) and the directors' and officers' obligations as the corporate managers of the not-for-profit organization (N-PCL § 701 & 713). EPTL § 11-2.3 (b) (3) (B) explicitly refers to the needs of a trust's beneficiaries" (*id.* at 4).

Further, the duty of loyalty "requires a director to have undivided allegiance to the organization's mission when using the power of his position or information he possesses concerning the organization or its property" (*see* Bjorklund et al., New York Nonprofit Law and Practice: With Tax Analysis § 11-3[a], at 393 [1997]).

respective positions in good faith and with that degree of diligence, care and skill which ordinarily prudent men would exercise under similar circumstances in like positions." Proper discharge of these duties ensures that a not-for-profit board's financial decisions are made soundly and legally, that an individual director, when faced with an opportunity that could benefit both the organization and him/herself, acts in the organization's interest first, and that the board prudently manages its assets in furtherance of its organization's stated charitable purpose, among other things. Put another way, these fiduciary duties are the high standards by which not-for-profit boards and individual directors are held accountable for the decisions they make and transactions they engage in. Being held to such a high standard of accountability would seem especially important when not-for-profit directors initiate and follow through with a plan that drastically changes the fundamental character of the corporation, like the instant Amended Plan of Conversion.

Turning to Chapter 1, Insurance Law § 7317 (f) (ii)[17] provides that it supercedes all inconsistent common-law and statutory duties, including fiduciary requirements. Chapter 1 does not set forth an adequate justification or explanation as to why it is appropriate to: (1) eliminate a not-for-profit director's fiduciary responsibilities; and (2) immunize that director from breach of fiduciary duty claims. As discussed above, fiduciary duties govern how a director performs his or her daily functions. Accordingly, the importance of these duties necessitates a rule that

---

**17.** Insurance Law § 7317 (f) (ii) provides:
"This section shall be deemed to supercede all otherwise applicable laws and legal requirements and compliance with this section and subsection (j) of section four thousand three hundred one of this chapter and the use of such funds as provided in such section, and in subsection (k) of this section, shall be deemed to constitute compliance with and shall supercede all such other legal requirements, including, but not limited to, statutory, common law and any other requirements relating to not-for-profit corporations and fiduciary requirements applicable to the board of directors of any company filing a plan pursuant to this section. In addition, and not in limitation of the foregoing, a transaction approved by the superintendent shall be deemed for all purposes to be a transaction that is fair and reasonable to an applicant and to promote the purposes of that applicant, and the use of proceeds as described herein shall be deemed for all purposes to be a use for a purpose that is consistent with and as near as may be to the purposes for which the applicant was originally organized and subsequently operated."

would prevent legislation of this kind in the absence of an adequate justification or explanation. Assessing the facts here, are the duties of care, loyalty and obedience, duties that a not-for-profit director must generally adhere to, so repugnant to Chapter 1 that their survival would deprive it of its efficacy and render its provisions nugatory (*see Woollcott v Shubert*, 217 NY 212, 220 [1916])? If the answer to this question is yes, that might be a proper justification or explanation for eliminating a not-for-profit director's fiduciary responsibility for a particular transaction. However, such a conclusion is not within the realm of contemplation.[18]

As noted above, plaintiffs argue that Empire's Board breached its fiduciary duty to preserve Empire's assets and pursue the corporation's charitable mission when it asked the Legislature to substitute its judgment in determining the disposition of Empire's assets (August 2001 letter) and acquiesced in the Legislature's taking substantially all of Empire's value for purposes other than carrying out Empire's mission (June 2002 Amended Plan of Conversion). According to the majority, "the heart of plaintiffs' grievance[ ] is that assets from the restructuring are not going to be used to further Empire's historic charitable purposes" (majority op at 347-348).

The majority counters plaintiffs' contention by making two arguments. First, the majority argues that Chapter 1 "supersedes all inconsistent common-law and statutory duties" (*id.* at 360; *see* Insurance Law § 7317 [f] [ii]).[19] Second, the majority argues that, "Even were the Court to somehow overcome this obstacle, the business judgment rule . . . bars plaintiffs' claims" (majority op at 360).[20]

---

**18.** In fact, there appears to be no adequate justification or explanation for elimination of the fiduciary obligations of not-for-profit directors.

**19.** As noted above, I believe this provision should be struck down.

**20.** See *Auerbach v Bennett* (47 NY2d 619, 629 [1979] ["'(The business judgment) doctrine bars judicial inquiry into actions of corporate directors taken in good faith and in the exercise of honest judgment in the lawful and legitimate furtherance of corporate purposes. 'Questions of policy of management, expediency of contracts or action, adequacy of consideration, lawful appropriation of corporate funds to advance corporate interests, are left solely to their honest and unselfish decision, for their powers therein are without limitation and free from restraint, and the exercise of them for the common and general interests of the corporation may not be questioned, although the results show that what they did was unwise or inexpedient' " (citation omitted)]). Note, *Auerbach* involved a for-profit corporation formed under the Business Corporation Law.

As to the majority's first argument, Chapter 1 not only improperly eliminates the fiduciary responsibility of directors but also seeks to prevent any judicial review of their actions. Chapter 1 is improper not only in eliminating the long-standing fiduciary responsibility imposed upon directors of not-for-profit corporations by N-PCL 717, but also by effecting a taking in violation of both the federal and state constitutions (*see* dissenting in part op of R.S. Smith, J.).

In addition, there are two reasons why the majority's second argument fails. First, the business judgment rule generally applies in commercial contexts; as such, the rule does not apply to Empire or other entities organized under the N-PCL. In *Matter of Levandusky v One Fifth Ave. Apt. Corp.* (75 NY2d 530 [1990]), this Court considered whether the business judgment rule should be applied to a building policy decision made by directors of a residential cooperative corporation governing board. This Court held that a standard of review analogous to the business judgment rule should be applied (*see Levandusky*, 75 NY2d at 537). In so concluding, this Court recognized that cooperative housing corporations function like for-profit entities and that they are formed under the Business Corporation Law.[21] Also, this Court limited this standard of review to the decisions of cooperative and condominium boards (*see Levandusky*, 75 NY2d at 537). The Court did not make a statement as to whether a similar rule would be applied to review the decisions of other types of not-for-profit corporations or organizations.

Second, even if the business judgment rule, or an analogous rule were applicable here, a significant tension between the rule and the not-for-profit directors' fiduciary duties is evident. Under the business judgment rule, courts cannot inquire into actions of corporate directors taken in good faith and in the exercise of honest judgment in the lawful and legitimate furtherance of corporate purposes. However, it is well settled that the business judgment rule does not apply to boards or individual directors who fail to act in good faith or within the scope of their authority (*see Levandusky* at 538; *Board of Mgrs. of 229 Condominium v J.P.S. Realty Co.*, 308 AD2d 314 [1st Dept 2003]). Thus, in order for a not-for-profit director to act in good faith, etc., he or she must necessarily exercise his/her fiduciary responsibilities (e.g., the duties of care, loyalty and obedience).

---

**21.** While cooperative housing corporations are formed under the Business Corporation Law, Empire was formed pursuant to the N-PCL.

Relying on the business judgment rule, the majority argues that,

> "To the extent that plaintiffs complain about action occurring before Chapter 1 was enacted (i.e., 'inviting' the Legislature to decide how to allocate Empire's not-for-profit assets), this claim is without merit because the plan of conversion—whether the one presented to the Superintendent in 1999 or the one presented to him after Chapter 1's enactment— was, in the Board's judgment, necessary to safeguard Empire's continued viability" (majority op at 360 [citation omitted]).

However, the Empire directors' August 2001 letter "inviting" the Legislature to decide how to allocate Empire's not-for-profit assets, as well as the June 2002 conversion plan, activities that are clearly in derogation of Empire's mission and corporate purpose, arguably amount to abdications of responsibility[22] and/or breaches of the fiduciary duties of care, loyalty and obedience. In other words, since there is a question as to whether the Empire directors breached their fiduciary duty, it cannot be presently argued that Empire's directors engaged in the type of actions that would shield them from judicial inquiry under the business judgment, or analogous, rule. Accordingly, it is premature to assert that: (1) the business judgment rule bars plaintiffs' claims; and (2) a court is not able to inquire into the actions of Empire's directors.

In sum, Empire's directors, by seeking to convert from a not-for-profit to a for-profit entity, by seeking the legislation necessary to facilitate such conversion, and by seeking the assistance of the Governor and the Legislature to pass such legislation, essentially sought to be bailed out by the State. In exchange for the bailout, the directors agreed that 95% of the value of Empire's assets would be used for public uses to be determined by the State and 5% for charitable purposes. In addition to agreeing to the asset allocation set forth above, Empire's directors also acceded to the elimination of their fiduciary obligations. Although not specifically stated in the record, apparently Empire's directors wanted to be immunized from challenges

---

**22.** Under N-PCL 701 (a), the "corporation shall be managed by its board of directors," not the Legislature or other government body. Clearly, the board of directors' management responsibility extends to the management of the corporation's assets.

that they breached their fiduciary duties.[23] This immunity was provided for in Chapter 1.[24]

## Conclusion

By upholding the portion of Chapter 1 that provides for the elimination of the fiduciary obligations of not-for-profit directors, this Court sets a dangerous precedent. Instead of striking down a measure that weakens the accountability of corporate directors, the majority has upheld it. New York State, like most states, seeks to promote strong corporate governance (accountability) rules. In view of recent scandals involving both for-profit and not-for-profit entities, the majority's holding is a step backwards.

The stated charitable mission and purpose of the organization are of primary importance when the not-for-profit board discharges its fiduciary obligations. The board must not act in contravention of that mission. Adherence to the legal standards that guide the conduct of not-for-profit boards, i.e., the fiduciary duties of care, loyalty and obedience, ensures that the day-to-day functions performed by the board are consistent with the organization's mission and purpose. Here, Chapter 1 annuls the fiduciary obligations of not-for-profit directors for no good reason.[25] Taking this into account, as well as the fact that, here, the Attorney General cannot exercise his normal oversight role over the conduct of Empire's board,[26] there is no way to hold the Empire board accountable for its actions related to the proposed conversion from a not-for-profit to a for-profit entity, a

23. But recall, Empire's outside counsel alluded to challenges regarding adhering to the duty of obedience (*see* n 4 at 364).

24. While this dissent addresses only the fiduciary responsibilities of the directors of Empire, plaintiffs may also have a valid argument with respect to New York Constitution, article III, § 17, which forbids the Legislature from "[g]ranting to any private corporation, association or individual any exclusive privilege, immunity or franchise whatever." While the majority concludes that the section applies only to monopolies and no monopoly exists here, the logical result of that conclusion is that the Legislature may, in any case involving a not-for-profit corporation, take over the assets of that corporation for public purposes and eliminate any fiduciary responsibility.

25. While Empire's outside counsel did allude to the challenges Empire faced in adhering to the duty of obedience (*see* n 4 at 364), this is not an adequate justification or explanation for the elimination of a not-for-profit director's fiduciary obligations.

26. Under N-PCL 112 (a) (7), the Attorney General normally can institute an action or proceeding "[t]o enforce any right given under this chapter to members, a director or an officer of a Type B or Type C corporation." For purposes of the action or proceeding, the Attorney General has the same

transaction that will change the character of Empire in a significant and fundamental way. Because they are not accountable for their actions, no Empire director has any incentive to mount a challenge to the proposed conversion under Chapter 1. Put another way, there is no one to ensure that the organization's mission and purpose are protected. Based on the foregoing, the portion of Chapter 1 that provides for the elimination of the fiduciary obligations of Empire's board should not stand.

In sum, the plaintiffs have asserted a valid cause of action for breach of a fiduciary duty, a cause of action that should be allowed to proceed in court. Therefore, in addition to joining Judge Robert Smith in his dissent, I dissent from the dismissal of the claim for breach of fiduciary duty.

R.S. SMITH, J. (dissenting in part). Suppose an ordinary private charity—say an art museum—found itself in the position of Empire here: unable to continue operating, but able to realize a large sum by selling its franchise or "going concern" value to private investors. Suppose the charity asked the State to allow the sale so that the charity could dissolve and turn the sales proceeds over to a new charitable entity that would continue to advance the old charity's purposes. Suppose the State answered by saying: "You can do it, but only 5% of the money can go to charity. The rest must be used for public purposes." And suppose further that the public purposes on which the State chose to spend the charity's money were worthy objects quite different from the charity's goals—the construction of a new prison, for example, or the retirement of state debt. Can anyone doubt that, on these hypothetical facts, there would be a taking of private property for public use without just compensation?

This case differs from my hypothetical in two ways: first, Empire is not an ordinary private charity; and secondly, the purposes chosen by the State for the use of Empire's property are not completely remote from the purposes of Empire. I conclude, for reasons I explain below, that these two distinctions do not justify dismissal of plaintiffs' complaint as insufficient on its face, and I therefore dissent from the result the majority reaches.

What troubles me more than the result in this admittedly close case, however, is that the majority, in upholding Chapter 1

---

status as such member, director or officer. Actions can also be brought on behalf of the corporation pursuant to N-PCL 720.

of the Laws of 2002, does not rely wholly on the two factors I have mentioned—the peculiar nature of Empire and the uses to which the State is putting Empire's money. Some parts of the majority's reasoning sweep more broadly, and would seem to justify upholding the hypothetical state action I have described. In other words, under the majority's reasoning, the State might, in circumstances like these, compel the use of 95% of an art museum's money for prison construction. I think these parts of the majority opinion are unnecessary to its result, and may cause trouble in future cases.

. . .

To decide the validity of Chapter 1 of the Laws of 2002 under the Takings Clauses of the federal and state constitutions, I find it necessary to address three questions: (1) Is the property of Empire private property? (2) If so, is the State free, under the Takings Clauses, to demand as much of that property as it wants in exchange for allowing Empire to sell its assets to a profit-making entity? (3) If the State is not free to demand all it wants, does Chapter 1 demand more than the Takings Clauses permit? I answer yes to the first question and no to the second. I conclude that the third question cannot be answered definitively on the face of the statute.

## I. Is Empire's property private?

As the majority opinion points out, Empire differs in many ways from a typical private charity. One difference is that Empire has had a more intimate relationship with, and has derived more benefit from, the state government than most private, nonprofit entities. The State, recognizing the important purposes that Empire has served, has repeatedly intervened to keep it afloat, allowing it to collect from hospitals at favorable rates, giving it a large outright subsidy, and imposing limits on Empire's competitors (see majority op at 340-341). The majority does not assert, however, that these facts make Empire into a public or quasi-public entity, or that they lessen the protection afforded to Empire's property under the Takings Clauses. Thus, for the majority, it seems that Empire's previous relationship with the State is simply background that, while it may make the taking of Empire's property by the State seem less offensive, is not directly relevant to the constitutional issue.

I agree that prior acts of government favoritism to Empire are constitutionally irrelevant; they do not make Empire's prop-

erty any less private. I know of no authority holding that the private nature of property is destroyed or diluted because of previous government benefits its owner has received, and I think it would be unwise to create, for Takings Clause purposes, a special category of government dependents whose property is not really their own. The State did not have to help Empire in the ways it did, and it could have attached more conditions to the help it gave; it could, for example, have required that the hundred million dollar cash subsidy given in 1993 be paid back if Empire were to dissolve. But the Legislature imposed no such requirement, and it is not free to say to Empire, in effect, "I am taking your property now because I saved your life back then." There may be farmers in this country who have been able to remain in business for years or decades because of government subsidies—but their farms are still their farms, and the government cannot take them without paying just compensation.

The majority mentions some other factors that distinguish Empire from an ordinary private charity, but these seem to me more clearly irrelevant. Surely Empire is not less a private entity because it was, for federal tax purposes, a "social welfare" organization under Internal Revenue Code (26 USC) § 501 (c) (4), rather than a "charitable" organization under section 501 (c) (3) (majority op at 339, 356). And the fact that Congress stripped Empire of its tax exemption because it found its activities too "commercial" (majority op at 340) weighs, if anything, on the side of making Empire that much more private.

In short, I conclude that Empire's property is private, and entitled to the same constitutional protection from uncompensated taking as any other private property.

## II. Can the State demand as much of Empire's property as it wants, in exchange for allowing conversion?

The majority opinion implies that Chapter 1 is not problematic because it gives Empire a choice. Empire, the majority notes, was not legally required to "convert" to profit-making status (more precisely, to transfer its assets to a profit-making entity in exchange for stock, and then sell the stock to the public and dissolve). "Chapter 1 does not compel Empire to convert. . . . [C]onversion only takes place if Empire so chooses" (majority op at 357). The majority acknowledges that Empire may have had no choice as a practical matter, but adds that "any duress stemmed from Empire's inability to prosper as a not-for-profit organization, not from pressure exerted by the State" (*id.* at 358).

The United States Supreme Court has made clear, however, that the Takings Clause limits a state's power to acquire private property by inducing the owner to surrender it in exchange for a needed government authorization. *Nollan v California Coastal Comm'n* (483 US 825 [1987]) involved homeowners who needed a permit from the California Coastal Commission to rebuild their home. The Commission granted permission, but only on condition that the Nollans allow the public an easement to pass across their property. The Supreme Court held that this was a taking, relying on the lack of an "essential nexus" between the condition attached to the government permit and the purpose that could have been served by refusing permission (483 US at 836-837). In the absence of such a nexus, the Supreme Court said, the State's restriction on the Nollans' right to rebuild their home amounted to " 'an out-and-out plan of extortion' " (*id.* at 837, quoting *J.E.D. Assoc., Inc. v Town of Atkinson*, 121 NH 581, 584, 432 A2d 12, 14 [1981]). In *Dolan v City of Tigard* (512 US 374 [1994]), the Supreme Court added a "rough proportionality" requirement to the "essential nexus" test. Even where a nexus existed, the Court held, the surrender of property that the state demands as a condition to permitting the development of land must be roughly proportional to the adverse impact that can be expected from the development.

These "exactions" cases refute the idea that, since the State was free to refuse to allow Empire's conversion, it was also free to allow it on condition that Empire give the State a 95% share of the proceeds. Defendants do not argue here, and the majority does not hold, that such a blatant holdup (more blatant than what actually happened in this case) could pass muster under the exactions cases—but the State does argue, and the majority seems to agree, that exactions analysis has no place outside the land-use context. (Majority op at 355 ["We decline . . . to expand our exaction analysis beyond the realm of land-use regulation"].) The implication, presumably, is that no "plan of extortion" by the State, no matter how gross, is invalid under the Takings Clause unless it is an interest in real property that is being extorted. This suggestion seems to me both unacceptable in principle and inconsistent with the Supreme Court's exactions decisions.

It is true that the *Nollan* and *Dolan* cases involve land use; indeed, many, probably most, takings cases involve real property. But the relevant clauses of the state and federal constitutions apply to real and personal property alike (*see e.g. Phillips*

*v Washington Legal Foundation*, 524 US 156 [1998]). I know of no precedent suggesting that the cash in a private bank account is subject to less protection under the Takings Clauses than a private house or tract of land. Different kinds of property sometimes call for different rules, of course, and it may well be that in cases not involving land use the details of the *Nollan* and *Dolan* nexus and proportionality tests will be modified, but it is unthinkable that the Constitution provides no protection at all against exactions of personal property.

Nothing in the Supreme Court's exactions decisions suggests that their rationale is limited to real property. Indeed, the *Nollan* case shows that it is not so limited in its discussion of *Ruckelshaus v Monsanto Co.* (467 US 986 [1984]), a case involving not real property but trade secrets. The dissent in *Nollan* argued that *Nollan* was similar to *Monsanto* (*Nollan*, 483 US at 859), while the majority distinguished *Monsanto* (*Nollan*, 483 US at 833 n 2)—but neither suggested that *Monsanto* was inapplicable because it was not a land-use case. Thus, both the majority and the dissent in *Nollan* assumed that like reasoning was applicable to real and personal property. And in *Dolan*, the Court made clear that the rules governing exactions are derived not from any peculiar characteristics of land-use cases but from "the well-settled doctrine of 'unconstitutional conditions,' " which limits the government's power to require surrender of a constitutional right "in exchange for a discretionary benefit conferred by the government" (*Dolan*, 512 US at 385).

Nor does our decision in *Matter of Smith v Town of Mendon* (4 NY3d 1 [2004]) imply that exactions analysis is inapplicable where no real property is involved. *Town of Mendon* did involve real property, and our discussion in that case focused on whether the Town's invasion of the Smiths' interest in real property was sufficient to trigger exactions analysis. We concluded that it was not because the Town had not required "the physical dedication of property to public use" but only "more modest conditions on development permits" (*id.* at 12).

I thus conclude that exactions analysis applies here; it would be unconstitutional for the State to require, as a condition to allowing Empire's conversion, that Empire pay 95% of its assets to the State or to whatever recipients the State found worthy. I cannot believe that the majority, despite some of the language in its opinion, would reach a different conclusion. Requiring the turning over of most of a private entity's wealth is not what we called in *Town of Mendon* a "modest" condition to a needed

governmental permission. The critical question, to which I now turn, is whether what actually happened here is fundamentally different from such a blatant, unconstitutional exaction.

### III. Has the State taken Empire's property?

In addressing the question of whether Chapter 1 provides for an unconstitutional exaction, I proceed by successively refining the question. First, I conclude that Chapter 1 is unconstitutional under the Takings Clauses if, but only if, a similar statute that unconditionally compelled the same uses of Empire's property would be unconstitutional. Secondly, I conclude that that question in turn depends on whether the compelled uses destroyed Empire's "investment-backed expectations." Finally, I conclude that the answer to that question turns on whether the uses provided for by the statute are reasonably consistent with the purposes of Empire. To this last restatement of the question, I find no clear answer on the face of Chapter 1, and I would therefore hold that further development of the facts is necessary.

Where a purportedly voluntary transaction is challenged under the Takings Clauses as an unconstitutional exaction, a preliminary step in the analysis is to consider whether the transaction, if involuntary, would be a taking of the property. Thus, in *Nollan* the Supreme Court began by saying that if the State had "simply required the Nollans to make an easement across their beachfront available to the public . . . we have no doubt there would have been a taking" (*Nollan*, 483 US at 831); the Court then inquired whether the transaction was a taking in view of its imposition as an exaction in response to a permit request. Here, then, the preliminary step is to consider whether there would have been a taking if the State had simply required Empire to distribute its assets as Chapter 1 provides, without offering Empire even the theoretical possibility of forgoing the conversion and continuing the status quo.

In this case, I believe, this preliminary step turns out to be decisive for the exactions analysis: if an involuntary transaction would have been a taking, the purportedly "voluntary" nature of this transaction, i.e., its imposition as an exaction, does not save it. Plaintiffs claim, in essence, that the uses of Empire's assets that Chapter 1 requires are the equivalent of transferring 95% of Empire's assets to the state treasury. If plaintiffs are right in this—or even if the correct percentage is as low as 60%—plaintiffs should win the case. If it is correct that Chapter

1 outside the exactions context would effect so enormous a taking, then the exactions analysis is collapsed. It seems impossible to argue, and no one does argue, that an exaction on such a scale could pass either the "nexus" and "rough proportionality" tests of *Nollan* and *Dolan*, or whatever counterpart to those tests might be applied to an exaction not involving real property. (The majority does offer an exactions analysis, which I discuss below, but that analysis does not accept the premise that the State is effectively acquiring most of Empire's assets.)

Thus, the dispositive issue is whether it would be a taking of property for the State to compel Empire, quite apart from any conversion plan, to distribute its assets in the way provided for by Chapter 1. The Supreme Court's recent summary of takings jurisprudence in *Lingle v Chevron U.S.A., Inc.* (544 US 528, 125 S Ct 2074 [2005]) provides a framework for approaching that question. *Lingle* identifies three categories of taking: a per se taking, i.e., a "direct government appropriation or physical invasion of private property" (544 US at —, 125 S Ct at 2081), exemplified by *Loretto v Teleprompter Manhattan CATV Corp.* (458 US 419 [1982]); and two kinds of "regulatory taking"— one exemplified by *Lucas v South Carolina Coastal Council* (505 US 1003 [1992]), in which a regulation "completely deprive[s] an owner of '*all* economically beneficial us[e]' of her property" (*Lingle*, 544 US at —, 125 S Ct at 2081, quoting *Lucas*, 505 US at 1019 [emphasis in *Lucas*]); and another involving a regulation that, though not destroying the property's value to the owner completely, is "so onerous that its effect is tantamount to a direct appropriation or ouster" (*Lingle*, 544 US at —, 125 S Ct at 2081). Regulatory takings challenges in this last category are governed by the standards set forth in *Penn Central Transp. Co. v New York City* (438 US 104 [1978]; *Lingle*, 544 US at —, 125 S Ct at 2081-2082). *Penn Central* lists a number of factors to be used in evaluating claimed regulatory takings; primary among these, the Court noted in *Lingle*, are " '[t]he economic impact of the regulation on the claimant and, particularly, the extent to which the regulation has interfered with distinct investment-backed expectations' " (*Lingle*, 544 US at —, 125 S Ct at 2081-2082, quoting *Penn Central*, 438 US at 124).

In *Nollan* and *Dolan*, the Court found that the dedications of landowners' property, if they had been imposed outside the exactions context, would have been per se takings. In this case, the requirements of Chapter 1, if imposed outside the exactions

context, would arguably be a regulatory taking and the issue of what *Penn Central* called "investment-backed expectations" should be decisive. The word "investment" may seem awkward in discussing the expectations of a not-for-profit entity, but I think the meaning of "investment-backed expectations" in this context is simply Empire's reasonable expectations as to the future use of its property. It seems clear that if Chapter 1 does not interfere with Empire's reasonable expectations there has been no taking. On the other hand, if these expectations are contradicted as to a large enough portion of Empire's property, a *Penn Central*-type taking has occurred, even assuming that there is no per se (*Loretto*) or "total" regulatory (*Lucas*) taking.

The question thus boils down to whether Chapter 1 is consistent with Empire's reasonable expectations for the use of its property. It is true that, in the situation it faced when Chapter 1 was passed, Empire could not have expected to keep its money in its own bank account—or, indeed, to have continued in existence as a going concern. Empire was no longer viable as a nonprofit health insurance provider. Empire could expect, however, that its assets would be protected by some limitation similar to the "quasi cy pres" requirement embodied in Not-For-Profit Corporation Law § 1005 (a) (3) (A). That statute says that assets of a "Type B" not-for-profit corporation like Empire shall be distributed after dissolution to "organizations engaged in activities substantially similar to those of the dissolved corporation." (*See also Matter of Multiple Sclerosis Serv. Org. of N.Y. [New York City Ch. of Natl. Multiple Sclerosis Socy.]*, 68 NY2d 32 [1986].) While defendants point out, correctly, that the Legislature was not constitutionally prohibited from altering the N-PCL 1005 standard, it was not free to destroy Empire's expectations entirely. Empire had a right to expect that any assets remaining after its debts were paid would be used in a way reasonably consistent with the purposes for which Empire existed. This is the sense in which the property of a charity or other not-for-profit entity is "private" property; although the owner of the property may not use it for personal gain, it has a right to the continuing dedication of the property to certain purposes (*see Illinois Clean Energy Community Found. v Filan*, 392 F3d 934, 937 [7th Cir 2004]) [observing, in a discussion of the taking of a charitable foundation's property, that "claims of unconstitutional taking are matters of expectation"]).

Empire's purposes are specified in article 43 of the Insurance Law. Under Insurance Law § 4301 (a), Empire existed "for the

purpose of furnishing medical expense indemnity . . . to persons . . . covered under contracts with" Empire. Under Insurance Law § 4301 (j) (1), Empire was "maintained and operated for the benefit of its members and subscribers." In short, Empire's general purpose was to help meet the public need for affordable health care coverage, and it could reasonably expect that, after its dissolution, its remaining assets would be devoted to that purpose or something reasonably close to it.

In accordance with those expectations, Empire's original restructuring plan called for its existing value, including the proceeds of the public offering, to be transferred to a charitable foundation "dedicated to promoting the availability and accessibility of high quality health care and related services to the people of the State of New York." This plan was approved by the Superintendent of Insurance, but never took effect, at least in part because, in the view of the Attorney General, it could not be accomplished without new legislation (see majority op at 341-344).

That new legislation, Chapter 1, alters the proposal to give Empire's existing value to a charitable foundation. The statute divides Empire's assets into a "public asset," consisting of "assets representing ninety-five percent of the fair market value of the corporation" and a "charitable asset," consisting of the remaining 5% (Insurance Law § 4301 [j] [3], [5]). The charitable asset is to be turned over to a foundation not dissimilar to the one that, under the original plan, was to receive all the money. The public asset, however, is destined, after expenses, for the Tobacco Control and Insurance Initiatives Pool, from which it is to be distributed by the Commissioner of Health as Chapter 1 directs. From this brief summary, Chapter 1 appears to take 95% of Empire's assets for public use, leaving only 5% to continue Empire's charitable purposes.

Defendants argue, however, that this superficial appearance of a 95%-5% public-to-charitable division is misleading. They argue that, when the specific purposes for which the public asset is to be spent are examined, they bear enough relationship to Empire's charitable mission so that Empire's reasonable expectations as to the use of its property have not been frustrated. The case turns, in my view, on whether defendants can sustain this argument, and I do not rule out the possibility that they can. I do not think, however, that it can be said on the face of Chapter 1 alone that defendants are right.

Most of the public asset—some 65%, by the majority's estimate (majority op at 346 n 12)—will be devoted to what Chapter 1 calls "[g]eneral hospital recruitment and retention of health care workers" (L 2002, ch 1, part A, § 1), i.e., to compensation and benefits for hospital employees. Plaintiffs assert that this aspect of the statute is "special interest legislation" designed to accomplish "political goals"—specifically, the funding of a labor contract. But in reviewing the constitutionality of the legislation we are required to assume that the Legislature believed supplementing the income of health care workers to be an important public goal, and the validity of that legislative judgment may not be questioned here (see *Paterson v University of State of N.Y.*, 14 NY2d 432, 438 [1964]; McKinney's Cons Laws of NY, Book 1, Statutes §§ 150, 151). To assume that this expenditure of funds is wise public policy, however, does not establish that Empire's property has not been taken for public use. The property has been taken unless the "recruitment and retention" expenditures are a reasonable way of advancing *Empire's* purposes.

Giving due weight to the presumption of validity attaching to legislation, I cannot conclude on this record that the portion of Chapter 1 that devotes Empire's assets to the "recruitment and retention of health care workers" should be upheld. There is no indication that the Legislature found that this use of Empire's funds was consistent with Empire's purposes, or that it ever considered the question. Nor has there been any presentation of facts or analysis that would support such a finding. I would insist that, at a minimum, defendants present some analysis supporting the conclusion that this use of funds will advance Empire's aim of making health care coverage more generally available to the citizens of New York. If a reasonable case can be made, I would find the legislation valid, and if not I would find it invalid. On the record we have, I would deny defendants' motion to dismiss the takings claim, and would leave the issue to be determined by summary judgment motions or at a trial if necessary. I would also leave open the validity of the other uses of the public asset directed by the Legislature, though I acknowledge that those uses (listed at pages 346-347 of the majority opinion) seem on their face more consistent with Empire's purposes.

The majority's analysis of Empire's "investment-backed expectations" is limited to the conclusory assertion that the distributions directed by Chapter 1 are "wholly consistent"

with Empire's mission (majority op at 358). The majority assumes, without discussion, that the State is free to spend Empire's money for any "public health purposes" it chooses (*id.* at 358), including the supplementing of hospital workers' income. I reject the idea that the constitutional limitations on the taking of private property are of so little force. They must require at least some reasoned demonstration that the expenditures chosen by the State will indeed advance Empire's purposes. That demonstration has yet to be made.

The assumption that Empire's purposes will be advanced by Chapter 1's use of Empire's property is also the basis for the majority's exactions analysis. Though the majority implies, as I mentioned above, that it thinks exactions analysis inappropriate, it concludes, in the alternative, that upon such an analysis this legislation would survive, because the "essential nexus" and "rough proportionality" called for by the *Nollan* and *Dolan* cases exist. Specifically, the majority finds "not only a nexus but a direct correlation between the State's interest in enacting Chapter 1—allowing Empire to continue to carry out its dual historic mission—and the condition imposed—that Empire's not-for-profit assets be used for the public health purposes specified in Chapter 1" (majority op at 355). It also finds that "the condition is 'roughly proportional' to the impact of Empire's conversion because if Empire were to convert through any other mechanism . . . it would be required to dedicate its not-for-profit assets to purposes similar to those for which it was formed . . ." (majority op at 356-357). Thus, the majority finds the tests for exactions to be satisfied because, according to the majority, Empire's assets are not being diverted from Empire's "mission."

I think the majority's exactions analysis is both unnecessary and wrong. It is unnecessary because, as I explained above, if Empire's assets are being used in a way consistent with Empire's reasonable expectations, the legislation would be valid even if the legislatively-prescribed uses were unconditionally compelled. If that is the case, there is no exaction and no need to do an exactions analysis.

The majority's exactions analysis is also wrong, because what the exactions cases require is not, as the majority assumes, a nexus between the condition imposed by the State and its purpose in enacting the legislation. They hold that there must be a nexus between the conditions attached to a permission given by the State and the grounds on which the State could

have withheld that permission. (*See Nollan*, 483 US at 837 [The issue is whether "the condition substituted for the prohibition . . . further(s) the end advanced as the justification for the prohibition"].) The majority may be implicitly reasoning that the State could have refused Empire permission to convert, and that its grounds for doing so would have been to cause Empire "to continue to carry out its dual historic mission" (majority op at 355). If that is the majority's reasoning, I find it unconvincing. Everyone in this case agrees that, if Empire had not been permitted to convert, it would have promptly gone out of existence, not fulfilling its "dual historic mission" or any other.

To me, the majority's exactions analysis is one of many aspects of its opinion that tend to obscure the basic question: whether Empire's reasonable expectations as to the use of its property have been respected. Because, to my mind, that question remains in doubt, I dissent from the decision dismissing plaintiffs' takings claims.

Judges CIPARICK, ROSENBLATT and GRAFFEO concur with Judge READ; Judge G.B. SMITH dissents in part in a separate opinion; Judge R.S. SMITH dissents in part in another opinion in which Judge G.B. SMITH concurs; Chief Judge KAYE taking no part.

Order modified, etc.